# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

*In re Marriage of Knoll*, 2016 IL App (1st) 152494

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF MARY BETH KNOLL, f/k/a Mary Beth Coyne, Petitioner-Appellant and Cross-Appellee, and ROY J. COYNE, JR., Respondent-Appellee and Cross-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-2494 |
| Filed<br>Rehearing denied | September 30, 2016<br>November 18, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-D-470; the Hon. Naomi Schuster, Judge, presiding. |
| Judgment | Civil contempt judgment vacated; judgment affirmed in all other respects. |
| Counsel on Appeal | Benton H. Page, Pamela J. Hutul, and Mile Knabe, of Davis Friedman, LLP, of Chicago, for appellant.<br><br>Paul L. Feinstein, of Paul L. Feinstein, Ltd., of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Hall and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1    The instant appeal arises from the trial court's finding that petitioner Mary Beth Knoll was in civil contempt for depriving respondent Roy Coyne, Jr., of his visitation rights with their minor child following the dissolution of the parties' marriage. On appeal, Mary Beth argues that the trial court's finding of civil contempt was erroneous, while in his cross-appeal, Roy argues that the trial court erred in finding that certain of Mary Beth's conduct was not contemptuous. For the reasons that follow, we vacate the civil contempt finding but affirm the trial court's finding of visitation abuse and its order of makeup visitation.

¶ 2                                    BACKGROUND
¶ 3                   I. Dissolution of Marriage and Joint Parenting Agreement
¶ 4    On January 15, 2003, Mary Beth filed a petition for dissolution of marriage, alleging that irreconcilable differences had caused an irretrievable breakdown of the marriage. The petition alleged that Mary Beth was pregnant, with the anticipated due date of March 29, 2003, and sought sole care, custody, control, and educational responsibility of the child.

¶ 5    The record indicates that the parties' son was born on April 10, 2003, and on April 17, 2003, the trial court entered a judgment for dissolution of marriage, which incorporated a marital settlement agreement and joint parenting agreement entered into by the parties. The joint parenting agreement provided that the parties would have joint legal custody of the child, with Mary Beth retaining the physical possession and primary residence of the child. The joint parenting agreement further set forth a visitation schedule and included a provision providing that "[t]he parents agree to be flexible in implementing the visitation program and, should a parent miss a scheduled visitation time for a valid reason, the parents shall attempt to 'make-up' the lost time by agreement."

¶ 6    The parenting agreement and visitation schedule were modified a number of times over the years, including on June 7, 2007, when Mary Beth was granted sole custody of the child. At the time of the civil contempt proceedings at issue in the instant case, the visitation schedule had been modified by a December 16, 2011, agreed order and provided, in relevant part:

> "a. *** [Roy] shall have unsupervised parenting time with [the child] every other weekend beginning on Friday at 3:15 p.m. and shall conclude Sunday at 4:00 p.m.
>
> * * *
>
> d. ROY will have [the child] for 10 consecutive days every summer from the third Friday in June at 5:00 pm until the Sunday 10 days later at 4:00 pm and such other times as the parties may agree in writing.
>
> ***
>
> f. ***
>
>     ***
>
>     ii. Every year ROY shall have [the child] on New Year's Day from 9:00 am until January 2 at 6:00 pm.
>
>     iii. Every year Roy shall have [the child] from December 28 at 9:00 am until December 31 at 5:00 pm."

- 2 -

Additionally, one provision of the original visitation schedule that had not been amended was a provision providing that Roy was entitled to parenting time with the child until 8 p.m. on Father's Day.

¶ 7                                    II. Petition for Visitation Abuse

¶ 8         On July 14, 2014, Roy filed several motions and petitions before the trial court, namely, (1) a motion to modify the parenting schedule, (2) a petition to enroll the child in therapy, and (3) a "Verified Petition for Finding of Visitation Abuse, Indirect Civil Contempt and Other Relief." It is the third petition that is at issue on appeal.

¶ 9                                             1. Petition

¶ 10        With respect to the petition for a finding of visitation abuse and indirect civil contempt, which is the petition at issue on appeal, count I of the petition was for visitation abuse and alleged that Mary Beth had violated the court orders concerning Roy's visitation with the child, who was now 11 years old, in a number of ways. First, under the heading "Missed Parenting time," the petition alleged that during Father's Day weekend 2014, Mary Beth contacted Roy to inform him that the child was not feeling well and that Roy would not be able to retrieve the child for his parenting time. However, the following day, the child texted Roy and informed him that he had recovered and was able to play in his baseball game later that day. When Roy requested makeup time for the missed Father's Day weekend visitation, Mary Beth responded that " '[the child] didn't want to go with you, he is more than willing to discuss that with the Judge,' " and would not agree to provide Roy with makeup time. The petition alleged that Mary Beth also refused to respond to Roy's request for makeup time for Roy's missed parenting time from December 28, 2013, to December 31, 2013, and January 1, 2014, to January 2, 2014.

¶ 11        Next, under the heading "Violation of Reasonable Telephone Access," the petition alleged that in January 2014, Roy was unable to communicate with the child for a period of six days, with the child not responding to Roy's texts and phone calls and Mary Beth not facilitating any communication between Roy and the child during that time period. The petition further alleged that "[a]s a regular occurrence during MARY BETH's parenting time," the child would not return Roy's phone calls or text messages. However, the child had his phone with him at all times during Roy's parenting time and was "very protective of his phone." The petition also alleged that, upon information and belief, during Roy's parenting time, Mary Beth "incessantly" called and texted the child at least 10 to 15 times a day on the child's cell phone to ask if he wanted to come home and had advised him " 'don't let your dad take your phone.' "

¶ 12        Under the heading "Loss of Opportunity to Vacation with Minor Child Due to Unreasonable Notice of Extracurricular Activities," the petition alleged that Mary Beth provided notice of the child's extracurricular activities one day prior to Roy's scheduled vacation time, when Roy had planned to take the child to Wisconsin during Roy's only scheduled period of summer vacation time with the child. The petition further alleged that, upon information and belief, Mary Beth advised the child that he would be allowed to attend his activities while exercising vacation time with Roy. The petition alleged that the child's scheduled activities occurred during the entire period of Roy's summer vacation period and, in light of this, Roy was unable to take the child to Wisconsin and Mary Beth would not agree to permit Roy to have any additional vacation time in order to take the child to Wisconsin.

¶ 13          Finally, under the heading "Not Mentally Preparing the Child for Visitation and Attempting to Prevent ROY from exercising his parenting time with [the child]," the petition alleged that on Friday, June 20, 2014, when Roy attempted to retrieve the child for his vacation parenting time, Mary Beth called the police in an attempt to stop Roy from taking the child. The petition further alleged that in the presence of police officers, Mary Beth continually asked the child if he wanted to go with Roy and told him that if he did not, he could stay at home. The petition alleged that the child indicated he wanted to leave with Roy and, after a period of 20 minutes, the child was allowed to leave with Roy.

¶ 14          Count I of the petition alleged that Roy was requesting makeup parenting time for his missed parenting time (1) on Father's Day weekend and (2) from December 28, 2013, to January 2, 2014, and also requested additional time in the summer to exercise vacation parenting time with the child. The petition further requested that the child be required to engage in therapy or counseling and that Mary Beth be required to facilitate at least one phone call per day from the child to Roy. Count I of the petition requested an order: (1) finding Mary Beth in civil contempt for visitation abuse, (2) entering a rule to show cause against Mary Beth requiring her to show cause why she should not be held in indirect civil contempt for her failure to comply with the court orders concerning visitation, (3) ordering the child to attend therapy, (4) ordering Roy to be allowed makeup parenting time for the missed visitation dates, (5) ordering Mary Beth to facilitate at least one phone call per day from the child to Roy, and (6) ordering attorney fees and costs for the preparation and presentation of the petition.

¶ 15          Count II of the petition was for indirect civil contempt and realleged the same factual allegations concerning visitation as in count I. Count II also alleged that Mary Beth violated several additional provisions of the judgment for dissolution of marriage. First, under the heading "Lack of Information concerning [the child's] Medical Issues," the petition alleged that on January 2, 2014, the child underwent a medical procedure, but Mary Beth did not inform Roy of the procedure until she contacted him on February 28, 2014, to seek payment for the procedure. Additionally, under the heading "Inability to Foster a Loving Relationship Between the Minor Child and Roy," the petition alleged that on June 20, 2014, when Roy arrived at Mary Beth's residence to pick up the child for his vacation time, Mary Beth repeatedly asked the child if he wanted to go and told him that he did not have to go with Roy if he did not want to go; she continued asking him despite the child indicating that he wanted to leave with Roy. The petition also alleged that Mary Beth called the police and refused to allow Roy to leave with the child until the police arrived. The petition further alleged that during Roy's parenting time, Mary Beth frequently texted the child to ask if he wanted to return home.

¶ 16          Count II of the petition alleged that Mary Beth "has demonstrated that she is unwilling to behave in a positive manner that would support and encourage the minor child to exercise parenting time with ROY and maintain a loving relationship with his father." The petition further alleged that her conduct was without compelling cause or justification and was contumacious and alleged that she had acted in willful violation of court orders. Count II requested an order: (1) finding Mary Beth to be in civil contempt; (2) entering a rule to show cause for Mary Beth to show why she should not be held in indirect civil contempt for her failure to comply with the terms of the judgment for dissolution of marriage and the December 16, 2011, agreed order; (3) ordering the child to attend therapy; (4) ordering Roy to be allowed makeup parenting time for his missed visitation time; (5) ordering Mary Beth to facilitate at

- 4 -

least one phone call per day from the child to Roy; and (6) ordering attorney fees and costs in the preparation of the petition.

¶ 17    Count III of the petition was for attorney fees and requested the costs and attorney fees that Roy had incurred because of Mary Beth's failure to comply with the court's orders.

¶ 18    In her response to Roy's petition, Mary Beth denied violating the court's orders concerning visitation. With respect to Father's Day weekend, Mary Beth explained that the child "suffers from a condition with his lymphatic and vascular system, whereby one of the symptoms results in him developing lesions on his sides and flesh which cause him pain and anxiety," and had suffered a flare-up of the condition shortly before June 13, 2014. Mary Beth took the child to his pediatrician, who recommended contacting the Mayo Clinic, which normally treated the child for his condition. After contacting the Mayo Clinic, Mary Beth was advised to ice and wrap the site, and was told that "if [the child] felt up to it he could play in his game—which he decided to do." Mary Beth had the child "notify his father immediately that he would be going to his game" and Roy attended the game "but did not speak to [the child] at all while he was there, and did not take [the child] or ask to take [the child] for his visitation." The next day, Mary Beth arranged for Roy to pick up the child, which he did at 11 a.m. Roy indicated that he would drop the child off at 8 p.m., but without any notification to Mary Beth instead dropped him off between 1 and 2 p.m.

¶ 19    Mary Beth also denied that she had refused to allow Roy makeup parenting time, claiming that she had been "generous" in permitting makeup time if there was no conflict in the family's schedule. Mary Beth further claimed that she had provided a cell phone for the child "for many years" and she had not interfered with the child's communications with Roy and the child "is free to communicate with his father as he wishes." Mary Beth claimed that Roy had also "greatly exaggerated her communications with" the child when he was with Roy, which were largely initiated by the child himself, and denied that she called and texted the child with the frequency suggested by Roy.

¶ 20    With respect to Roy's summer vacation time, Mary Beth explained that the child had been playing baseball in a league since he was very young and that both she and Roy had encouraged the child's participation. The league did not send out its playoff schedule until late in 2014, and Mary Beth claimed that Roy received the schedule directly via e-mail from the coach and had the schedule as long as Mary Beth did. Mary Beth claimed that she had nothing to do with the interference of the child's games and practices during Roy's vacation time and stated that she also had to modify her schedule to accommodate her children's activities.

¶ 21    Mary Beth also denied that Roy was unaware of the child's January 2, 2014, medical procedure. She claimed that Roy was e-mailed and informed about the medical treatments and, in fact, traveled to Minnesota and spoke to the child's physicians on January 3, 2014. In addition, Roy texted and communicated with the child about his meeting with the doctors at the Mayo Clinic. Mary Beth attached a document from the Mayo Clinic in which it stated that the doctor "discuss[ed] the result of investigation and treatment with [the child's] father" on January 3, 2014. Finally, Mary Beth denied Roy's account of the events of June 20, 2014, claiming that she did not encourage the child not to visit with Roy but, instead, the child "did not want to go because of the circumstances created by Roy" and, in fact, still left with Roy for his visitation.

¶ 22                                                          2. Trial

¶ 23        The parties came before the court for a trial on Roy's petition. Mary Beth and Roy testified on their own behalf and Mary Beth's husband, Brian Knoll, testified on Mary Beth's behalf.

¶ 24        Roy testified that under the parties' parenting agreement, he was entitled to visitation on June 13, 2014, through June 15, 2014, which was Father's Day weekend. However, Mary Beth informed Roy that he would not be able to exercise his parenting time that weekend because the child was ill. On Saturday, the child sent Roy a text message at 4 p.m. informing Roy that he was feeling better and would be attending his baseball game. Roy was able to exercise his parenting time with the child on Sunday, from 11 a.m. until 3 p.m., which was "the only time that Mary Beth would allow [him] to have." Roy testified that he saw the child, as well as Mary Beth and her husband, Brian, on Saturday but did not communicate with them "[b]ecause with what was going on Friday with just deciding to pull my entire weekend visitation, I wasn't going near them as I figured something was up. And whenever they start acting like that, I don't go near them, because I am not going to walk into a trap. I was alone and without a witness. So I stayed as far away from them as I could."

¶ 25        Roy also testified that he exercised parenting time on December 25, 2013. When he picked the child up, Mary Beth invited Roy inside and told him that the child's side was swelling in the area where he had an earlier operation. She showed Roy the child's side and told Roy that she was going to call the Mayo Clinic and see if she could get an appointment as soon as possible. Roy looked at the child's side and testified that he observed "[n]o difference at all" from how it normally looked. The child was at the Mayo Clinic from December 28 to December 31. While there, he had appointments with a surgeon and a dermatologist and had a magnetic resonance imaging (MRI) test. Roy testified that he did not sit in on the appointments; Roy explained that the child's first appointment was for an MRI and Roy arrived at the appointment early but discovered that the child had already been checked in. Roy went to the location of the MRI but was informed that the child was currently undergoing the test and the nurse would not allow him into the room. The second appointment was to learn the results of the MRI, and Roy again arrived at the appointment early; "[a]s soon as Mary Beth and [the child] showed up, she saw [Roy] there. She left. And the next thing you know the security guards showed up trying to remove [him] from the hospital." Roy also testified that he asked Mary Beth for the child's medical records but she would not provide them and told him "that she had sole custody, and she didn't have to tell [him] anything." Roy testified that he requested makeup parenting time from Mary Beth several times but was not granted makeup time "until I filed this motion."

¶ 26        Roy also testified about his summer parenting time in 2014. He testified that he was planning on going to Wisconsin with the child for a fishing trip but that the night before his vacation, he received an e-mail from Mary Beth "which was more so an itinerary of every day of my vacation activities that [the child] had to be at. And it varied from baseball games, practices, golf, band car wash, band practices. So pretty much every day of my vacation he had stuff I had to take him to." Roy testified that Mary Beth had not provided him notice of these activities prior to that e-mail and that he did not have access to the schedule, school records, or band activities. When Roy arrived to pick up the child on June 20, he called a few times and rang the doorbell, but nobody answered. He waited 15 to 20 minutes "and then finally two police cars showed up out of nowhere. Mary Beth had called the police." Roy also testified that he had requested makeup parenting time for the summer vacation period, but Mary Beth did

not allow it. He testified that when he requested parenting time, "[s]he just doesn't answer my requests. She just ignores them."

¶ 27　　After Roy's testimony, the trial court found that there was a *prima facie* case of visitation abuse, meaning that the burden then shifted to Mary Beth to demonstrate whether she complied with the court's orders and whether any failure to comply was willful or contumacious.

¶ 28　　Mary Beth testified that she had never asked the child's school not to give any records to Roy. In July 2012, she had asked Brian, her husband, to provide Roy with the information to access the child's school portal information, so that Roy could log on and access the child's grades on a daily basis. She testified that her parents were listed as the child's emergency contacts at school, because they lived in the same town as the school and were retired, so they would be available if anything happened at school.

¶ 29　　Mary Beth testified that for Christmas 2013, the child received a cell phone, so that he would be better able to communicate with her or Roy when he was with the other parent. Mary Beth denied reading the child's messages until the instant petition was filed, when the child gave her permission to read his messages and download them. Mary Beth also denied that she or her husband ever wrote any messages to Roy from the child's phone that they pretended were from the child.

¶ 30　　Mary Beth testified that, since he was an infant, the child had suffered from "lymphatic and vascular malformations," in which the child occasionally presented with tumors that needed to be removed. The child was initially treated in Chicago but was encouraged to seek treatment at the Mayo Clinic. Mary Beth testified that on Christmas morning 2013, the child had clear lymphatic bubbles on his side, as well as two blood bubbles; she testified that "[t]he clear lymphatic bubbles we have seen before, but not the blood bubbles." The child went with Roy for his visitation, and Mary Beth contacted the child's doctor at the Mayo Clinic. She sent photos of the child's side to the doctor's nurse and received a phone call on December 30 scheduling an appointment on December 31. Mary Beth informed Roy of the child's appointment via text message. Mary Beth and the child flew to the Mayo Clinic on December 31, where they met with the child's doctor, who scheduled the child for an MRI on January 2. When Mary Beth and the child arrived for the MRI, they had preregistered, so they went directly to the MRI lab. During the child's MRI, Mary Beth waited in a waiting area; she did not go into the MRI room with him. During the MRI, Roy was in the lobby area. After the MRI, they had a tentative appointment with the doctor that afternoon but needed to first meet with dermatology, so Mary Beth asked Roy if he wanted to take the child out to lunch, but Roy declined. Mary Beth testified that she received information about the child's appointments at the Mayo Clinic by calling and giving the child's "Mayo Clinic number" to find out his scheduled appointments; she further testified that Roy had access to this information because "[i]t had been on every single bit of communication ever since [the child] was assigned a Mayo Clinic number when he was an infant." The dermatology appointment took longer than scheduled, because one of the child's blood blisters had cracked and was bleeding, so Mary Beth and the child arrived for their next doctor's appointment at 4 p.m. instead of the scheduled 3:30 time. When they arrived, Roy was in the waiting area and began screaming at Mary Beth and the child, asking where they had been. The child began crying immediately and Mary Beth asked if she and the child could be put in a room in the back so that they would not have to be in the same waiting area as Roy. Mary Beth testified that "[n]ext thing I knew, security showed

up"; she did not contact security and did not know who had done so. Mary Beth and the child were taken to an office in the back and Roy was asked to leave.

¶ 31 As to Father's Day weekend, Mary Beth testified that on Thursday, June 12, 2014, the child was not feeling well and his side was swollen. Mary Beth contacted the Mayo Clinic and notified Roy. The Mayo Clinic instructed her to "take it easy" with the child for the weekend and to ice his side and wrap it if necessary. On Friday, the child was still not feeling well and was nervous about whether the problem was going to resolve itself or get worse. He wanted to stay home for the weekend, so Mary Beth sent Roy a text message informing him. Roy responded, telling Mary Beth that he was more than capable of taking care of the child and threatening to call the police if she did not send the child with him; Mary Beth testified that Roy was "definitely" capable of taking care of the child and his medical condition. Mary Beth informed the child that he needed to go, but the child still did not want to go. Mary Beth prepared the child's things, and Roy arrived to pick him up. Roy and the child had a discussion and ultimately determined that they would do something on Sunday, Father's Day; Mary Beth testified that Roy was not angry "at all" and was "very respectful" when he spoke to the child and then left. The next day, the child was feeling better and decided he wanted to play in his scheduled baseball game; the child notified Roy through text messages. Mary Beth and Roy both attended the game but did not communicate; Roy did not ask if he could take the child home with him. On Sunday, Roy picked the child up at 11 a.m.; he was allowed to have him until 8 p.m. under the court order but arranged to bring him home at 3 p.m. and actually brought him home at 1:30 p.m. On cross-examination, Mary Beth admitted that she responded to Roy's request for makeup time by stating that " '[a]s far as making up visitation for last weekend, [the child] didn't want to go with you. He is more than willing to discuss that with the judge.' " Mary Beth admitted that "[i]t was totally wrong" for her to say that and that she never discussed her comment with the child.

¶ 32 With respect to summer vacation, Mary Beth testified that the night before Roy's scheduled visitation, the child asked Mary Beth to send Roy a list of the child's previously scheduled activities so that he would have a list of everything that the child was supposed to attend, which included baseball, band, and golf; Mary Beth sent Roy an e-mail with this information but did not insist that the child attend every one of the activities. Mary Beth was under the impression that Roy knew about all of the child's activities, as he was involved with the child's participation in them. Mary Beth did not add any activities to the child's schedule and all of his activities were ones that he had engaged in previously: that year's baseball schedule had been released in October 2013, and he had participated in band camp and golfing for the past two years. Mary Beth testified that Roy contacted her 45 minutes before his parenting time was scheduled to begin, seeking to reschedule it, but Mary Beth was unable to accommodate him on such short notice due to her own schedule. Roy arrived to pick the child up "and parked sideways on the driveway and was wailing on his horn." Even though the child was prepared to do so, he did not want to leave with Roy, and Mary Beth contacted the police due to Roy's behavior and the child's refusal to leave. The police spoke with the child, and between them, Mary Beth, and Brian, they were able to convince the child to leave with Roy. Mary Beth denied calling the child "incessantly" during Roy's parenting time and testified that her phone records showed that she called the child seven times during the period of summer parenting time and that the child called her seven times. Mary Beth testified that she also texted

with the child and estimated that they would have texted not more than 10 times during that period.

¶ 33    Mary Beth testified that after the visit at the Mayo Clinic, the relationship between her and Roy changed; she described it as "horrible" and said there was "not much communication" and that any communication was through Brian, her husband. Mary Beth testified that the child continued visiting and communicating with Roy, including a number of requests from Roy for extra visits that Mary Beth always granted.

¶ 34    Brian Knoll, Mary Beth's husband, testified that he was able to access the child's school records through an online portal, which the school district began implementing in 2012. The portal could be accessed using a school-provided username and password; Brian passed that information along to Roy in July 2012 at Mary Beth's request. He explained that at the time, he had been e-mailing Roy all of the child's progress reports and report cards, so sending the information to Roy would allow him to access that material himself.

¶ 35                                    3. Trial Court Order

¶ 36    On August 5, 2015, the trial court entered an order on Roy's petition. Concerning Father's Day weekend, the trial court noted that "[t]his Court finds it incredibly unnerving the amount of responsibility the parties give to their twelve-year-old child. The Court is concerned that Mary Beth allows [the child] to pick and choose when he wants to visit with either parent and also let [the child] decide when he can play in a baseball game after claiming a medical ailment prevented him from visiting with his father. This Court is by no means downplaying [the child's] medical issues; however, if [the child] is too sick to visit with his father, then he should not be playing in a baseball game the next day. At the very least, Mary Beth should have informed Roy that [the child] was feeling better. The fact that Roy was only informed of [the child's] well-being through a text from [the child] about his baseball game calls into question the creditability of the statements made by Mary Beth in alleging that she did not interfere in Roy's parenting time." The court did, however, note that Roy had parenting time on Father's Day itself, June 15, 2014, from approximately 11 a.m. to 2 p.m., and found that Roy had not presented clear evidence to establish that Mary Beth restricted his parenting time on Father's Day.

¶ 37    With respect to Roy's summer parenting time, the court found that the evidence established that Roy was informed of the child's band camp schedule through a text sent by the child on June 12, that he had a copy of the child's baseball schedule and that he knew or should have known of the continued baseball schedule due to playoffs. The court noted that "[i]t is not visitation abuse when the minor child has pre-planned activities, like [the child], that he or she has been a part of for an entire sport's season or year, especially when both parents are aware of the activities and have supported the child throughout his or her participation in the activities." The court found that there was no evidence that Mary Beth interfered with Roy's summer parenting time and further found that Roy was able to exercise his summer parenting time with the child. The court did, however, criticize Mary Beth's decision to involve the police in the parenting time exchange that occurred on June 20, 2014, noting that "Mary Beth and Roy are the parents of [the child], not the police. It is not the responsibility of the police department to talk [the child] into going with his father for parenting time. It is unlikely that the presence of the police did little more than scare the child into attending parenting time with

[his] father. This Court hopes that both parties consider the potential negative impact on the minor child before engaging the police in future parenting time exchanges."

¶ 38 Finally, concerning the child's trip to the Mayo Clinic at the end of December 2013, the court found that "[w]hile it is unfortunate that the appointment fell on Roy's parenting time," Mary Beth did not intentionally schedule the appointment in an attempt to interfere with Roy's parenting time. The court found that the child had a severe medical issue known to both parents, sustained a flare-up of that medical issue on December 25, 2013, and necessary medical follow-up was sought by Mary Beth as soon as possible. The court further noted that Roy was informed of the appointment and even drove to Minnesota to visit the child. However, the court found that Roy requested makeup time for the period of parenting time that he missed and that it was unclear whether Mary Beth ever agreed to the requested makeup time; the court found that "through Roy's testimony and the evidence presented, it appears that Roy's request was ignored."

¶ 39 After making the above findings of fact, the court concluded:

"1. Roy was scheduled to have parenting time with [the child] on June 13, 2014 through June 15, 2014; December 28, 2013 through December 31, 2013 and January 1, 2014 through January 2, 2014; and from June 20, 2014 through June 29, 2014.

2. *** The weekend of June 13 through June 14, 2014 fell on Roy's parenting time weekend. Mary Beth denied him the right to exercise his parenting time with the minor child as outlined in the December 16, 2011 Agreed Order. She has not given any legally sufficient reasons for failure to comply with the aforementioned order and her failure to comply with the order was willful and contumacious. Her conduct defeated and impaired the rights and interests of Roy and has further impeded and obstructed the Court in its[ ] administration of justice.

3. *** In 2014, Roy's summer vacation parenting time based on the aforementioned Agreed Order was from June 20, 2014 to June 29, 2014. For that time period, Roy was able to exercise his summer vacation parenting time with [the child], despite [the child's] summer activity schedule. Although Roy's parenting time was subject to the child's activity schedule, it was not due to any willful or contumacious behavior of Mary Beth.

4. *** For the time period of December 28, 2013 through December 31, 2013 and January 1, 2014 through January 2, 2014, Roy was not able to exercise all of his awarded parenting time due to [the child's] medical issues which caused the necessity of traveling to Rochester, Minnesota for medical treatment. Although Roy missed the parenting time, it was not due to any willful or contumacious behavior. Mary Beth had a legally sufficient reason for failing to comply with the aforementioned order.

5. Pursuant to Paragraph 3.4 of the parties' Judgment for Dissolution of Marriage entered on April 17, 2003, which allows for makeup parenting time when a party is unable to exercise his or her allotted parenting time, Roy should have received make up parenting time for the parenting time he missed on June 13 through June 14, 2014 and the days he missed between December 28 through December 31, 2013 and January 1 through January 2, 2014."

¶ 40 The court granted count I of Roy's petition, which was for visitation abuse, in part, ordering:

"a. Petitioner, Mary Beth Knoll f/k/a Mary Beth Hickey Coyne, is hereby found and declared to be in indirect civil contempt of Court for her willful failure to obey the Court's Order as herein stated and for visitation abuse for the time period of June 13 and 14, 2014;

b. The parties shall immediately determine a make-up parenting time schedule for the parenting time missed by Respondent, Roy James Coyne, for the periods of June 13 through June 14, 2014 and the days that Roy missed parenting time during [the child's] 2013 Winter Break, pursuant to Paragraph 3.4 of the parties' Judgment for Dissolution of Marriage entered on April 17, 2003."

The court, however, denied count II of the petition, which was for indirect civil contempt. With respect to count III, Roy's attorney fees, the court ordered that attorney fees were "subject to further court order entered after the filing of the proper petition."

¶ 41 On September 2, 2015, Mary Beth filed a notice of appeal, appealing the trial court's finding her to be in civil contempt. On September 15, 2015, Roy filed a notice of cross-appeal, appealing the trial court's denial of count II of the petition as well as the trial court's "findings and rulings as to any relief denied to him."

¶ 42                                        ANALYSIS

¶ 43 On appeal, Mary Beth challenges the trial court's finding her in civil contempt with respect to Father's Day weekend and also challenges the trial court's finding that Roy was entitled to makeup visitation. In his cross-appeal, Roy argues that the trial court "erred in denying certain relief to" him. Prior to considering the merits of the parties' arguments, we must first discuss an issue raised by Roy concerning this court's jurisdiction to hear the instant appeals. The question of whether we have jurisdiction over the instant appeals presents a question of law, which we review *de novo*. *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 25; *In re Marriage of Gutman*, 232 Ill. 2d 145, 150 (2008). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 44 In the case at bar, Mary Beth claims that there are two separate bases for jurisdiction. One such basis is Illinois Supreme Court Rule 304(b)(5) (Feb. 26, 2010), which provides that "[a]n order finding a person or entity in contempt of court which imposes a monetary or other penalty" is appealable without a Rule 304(a) finding. Our supreme court has made clear, however, that "only a contempt *judgment that imposes a sanction* is a final, appealable order." (Emphasis in original.) *Gutman*, 232 Ill. 2d at 152. Here, Mary Beth claims that the trial court found Mary Beth to be in civil contempt of court "and penalized her by ordering her to cede a portion of her time with [the child] to Roy as make-up visitation." While we are mindful that, to the parent, any reduction in parenting time feels like a penalty, Illinois law establishes that parenting time is something that is guided by the best interests of the child and is not a vehicle used to punish either parent. See, *e.g.*, 750 ILCS 5/607(c) (West 2012) (providing that "[t]he court may modify an order granting or denying visitation rights of a parent whenever modification would serve the best interest of the child"); *Pryweller v. Pryweller*, 218 Ill. App. 3d 619, 633 (1991) ("We also emphasize that, even in contempt proceedings involving visitation abuse issues, the importance of the children's best interests must not be lost, and the children should not be used as pawns."); *In re Marriage of Mitchell*, 319 Ill. App. 3d 17, 22 (2001) ("Visitation should not be used to penalize or reward parents for their conduct."). Thus,

the trial court's finding that Roy was entitled to makeup parenting time cannot be considered a penalty or sanction imposed on Mary Beth that would render the civil contempt order appealable.

¶ 45 Mary Beth also claims that we have jurisdiction under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994),[1] which provides for appeals from final judgments, despite the fact that there are several outstanding matters between the parties, including Roy's petitions for modification of the visitation schedule, enrolling the child in therapy, altering the drop-off and pick-up points for visitations, and attorney fees. " 'An order is final and appealable if it terminates the litigation between the parties on the merits or disposes of the rights of the parties, either on the entire controversy or a separate part thereof.' [Citation.] Absent a Rule 304(a) finding, a final order disposing of fewer than all of the claims is not an appealable order and does not become appealable until all of the claims have been resolved." *Gutman*, 232 Ill. 2d at 151 (quoting *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 159 (1998)).

¶ 46 However, Mary Beth cites a line of cases[2] in which our appellate courts have held that a postdissolution order may be an appealable order even if other postdissolution matters are pending, so long as the matters are sufficiently unrelated. See *In re Marriage of A'Hearn*, 408 Ill. App. 3d 1091, 1098 (2011) (finding jurisdiction where pending petitions for rule to show cause were not related to a petition for modification of custody at issue on appeal); *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 38 (finding jurisdiction where a party's petition for attorney fees was "wholly unrelated" to the issues presented in the removal petition at issue on appeal); *In re Baumgartner*, 2014 IL App (1st) 120552, ¶ 36 (finding jurisdiction where a pending petition for attorney fees was unrelated to the determination of the parties' obligation to provide educational expenses for their child). See also *In re Parentage of Rogan M.*, 2014 IL App (1st) 132765, ¶ 14 (noting the "need for the reviewing court to examine the relationship of any pending matters to those being appealed"). In the case at bar, we agree with Mary Beth that the matters remaining pending between the parties are unrelated to the petition at issue on appeal. The pending matters all concern either the parties' visitation schedule in the future or Roy's attorney fees. These issues are wholly unrelated to the question of whether Mary Beth engaged in visitation abuse in 2013 and 2014. Accordingly, we find we have jurisdiction over the instant appeals and proceed to consider their merits.

¶ 47 I. Mary Beth's Appeal

¶ 48 We first consider Mary Beth's appeal, in which she claims that the trial court order finding her in civil contempt was erroneous in several respects. First, she claims that the trial court's finding that she willfully failed to comply with the court's orders concerning visitation was contrary to the evidence adduced at trial. Next, she claims that the order was invalid because it did not contain a provision allowing her to purge herself of the civil contempt. Finally, she claims that Roy had received makeup visitation on numerous occasions, and therefore, the trial

---

[1]Mary Beth actually claims we have jurisdiction under Illinois Supreme Court Rule 303 (eff. Jan. 1, 2015). However, Rule 303 provides the procedures for appealing from final judgments. Ill. S. Ct. R. 303 (eff. Jan. 1, 2015). It is Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) that actually provides that "[e]very final judgment of a circuit court in a civil case is appealable as of right."

[2]We note that there is a split of authority on this issue. See *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶¶ 26-37 (discussing the conflict between courts).

- 12 -

court erred in finding he was entitled to makeup visitation. We consider each argument in turn.

¶ 49                                    A. Finding of Civil Contempt Due to Visitation Abuse

¶ 50        Mary Beth first argues that the trial court's finding that she was in civil contempt because she denied Roy's visitation was contrary to the evidence heard by the trial court. "Generally, civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party." *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). "Where a parent is found in contempt for failure to turn a child over to the other parent for visitation or custody, the conduct occurs outside of the court's presence and must be construed as indirect contempt." (Emphasis omitted.) *Pryweller*, 218 Ill. App. 3d at 630. "Proof of willful disobedience of a court order is essential to any finding of indirect civil contempt." *In re Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17. The burden initially falls on the petitioner to establish, by a preponderance of the evidence, that the alleged contemnor has violated a court order. *McCormick*, 2013 IL App (2d) 120100, ¶ 17. Once that burden is satisfied, the burden shifts to the contemnor, who has the burden of showing that the violation was not willful and contumacious and that he or she had a valid excuse for failing to follow the order. *McCormick*, 2013 IL App (2d) 120100, ¶ 17. "Contumacious conduct consists of 'conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or lessening the authority and dignity of the court.' " *Charous*, 368 Ill. App. 3d at 108 (quoting *In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 349 (1992)). "Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court should not disturb the trial court's determination unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion." *McCormick*, 2013 IL App (2d) 120100, ¶ 17. "A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." (Internal quotation marks omitted.) *Demaret*, 2012 IL App (1st) 111916, ¶ 43.

¶ 51        In the case at bar, the trial court found that on June 13 and 14, 2014, Mary Beth denied Roy the right to exercise his parenting time with the child as outlined in the December 16, 2011, agreed order and further found that Mary Beth's failure to comply with the order was willful and contumacious.[3] Mary Beth claims that "[t]he trial court supplies no facts or reasoning whatsoever to explain how Mary Beth denied Roy visitation; the order does not state (1) how Mary Beth denied Roy his right to exercise visitation, (2) how Mary Beth failed to comply with the trial court's order, or (3) how Mary Beth's claimed failure to comply was willful." We do not find this argument persuasive.

¶ 52        First, in an indirect civil contempt proceeding, "[t]he judge does not have full personal knowledge of the elements, and proof of facts of which the court cannot take judicial notice must be presented in order for the court to make a finding of contempt." *Pryweller*, 218 Ill. App. 3d at 629. "An appellate court will accordingly have at its disposal the benefit of the record, including the petition alleging specific acts of contempt and the testimony adduced at

―――――――――――

[3]We note that the trial court did not find Mary Beth in civil contempt concerning Roy's summer 2014 vacation or the trip to the Mayo Clinic at the end of 2013. While the court found that Roy was entitled to makeup time for the latter, in its findings of fact, the court expressly noted that "[a]lthough Roy missed the parenting time, it was not due to any willful or contumacious behavior. Mary Beth had a legally sufficient reason for failing to comply with the aforementioned order."

the hearing, to adequately determine whether the finding of contempt is substantiated." *In re Marriage of Betts*, 155 Ill. App. 3d 85, 98 (1987). Since "[t]he purpose of requiring that facts constituting contempt be set forth with specificity is to afford an appellate court a basis for reviewing the contempt order" (*Betts*, 155 Ill. App. 3d at 97-98), in an indirect civil contempt proceeding, "such a failure under the facts is not fatal" (*Betts*, 155 Ill. App. 3d at 97).

¶ 53       Furthermore, in the instant case, the trial court order did explain the factual basis for its decision, contrary to Mary Beth's contention. The court's order states that the testimony of the parties revealed that the weekend of June 13 through June 15, 2014, was allocated to Roy for parenting time. However, on June 13, Mary Beth contacted Roy to inform him that the child wanted to stay home due to a flare-up of his medical issue. Roy nevertheless sought to exercise his parenting time, coming to Mary Beth's home to pick up the child. After a discussion with the child, Roy left without him and made plans to exercise parenting time on Father's Day, June 15. Thus, Roy was not allowed to exercise his parenting time on June 13 or 14, despite the trial court's finding that "Roy's ability to care for [the child] was never in question." The next day, Roy received a text message from the child—not from Mary Beth, which the trial court found significant—indicating that the child would be playing in his baseball game that afternoon. The trial court made clear in its order that it was "concerned" that Mary Beth permitted the child to "pick and choose" when he would visit with Roy and that Mary Beth permitted the child to decide to play in his baseball game after being too ill to visit with Roy the prior day. We note that "Illinois courts have held that a custodial parent may not disregard the visitation requirements of a dissolution judgment merely because his or her children do not desire to visit the noncustodial parent." *Charous*, 368 Ill. App. 3d at 111. In other words, it was not the child's choice as to whether Roy would be able to exercise visitation on June 13 or 14—as the custodial parent, such a decision fell to Mary Beth. See *Charous*, 368 Ill. App. 3d at 112 ("[The custodial mother] cannot escape responsibility for her failure to comply with the visitation provisions of the parenting agreement by shifting the blame to the children. Although [the children] were not children of tender years, they were nonetheless minor children under the care, control, and custody of [the mother]."). The trial court in the instant case found that Mary Beth had not demonstrated any justification for denying Roy his parenting time, and we cannot find that such a decision was against the manifest weight of the evidence.

¶ 54       Mary Beth argues that she did not deny Roy's visitation rights and that, instead, Roy "voluntarily elected to forego his visitation and made no attempt to resume it." She claims that after Roy arrived at her home on June 13, he "voluntarily left" after inspecting the child's side and further claims that he made no effort to resume his visitation until June 15, despite knowing that the child felt well enough to play in his baseball game. However, "[w]itness credibility and resolution of conflicts in evidence are matters within the discretion of the trial judge and should not be disturbed upon review." *Moniuszko v. Moniuszko*, 238 Ill. App. 3d 523, 530 (1992). Here, the trial court observed both parties testify during a several-day-long hearing and we will not second-guess its determination that Roy was denied his visitation instead of "voluntarily elect[ing] to forego" it, as Mary Beth contends.

¶ 55                                            B. Purge Provision

¶ 56       Mary Beth's second argument on appeal is that the trial court's civil contempt order was invalid as it did not contain a purge provision. Our supreme court has explained that "[w]hen a

party is found in civil contempt of court, *** the contempt order is coercive in nature. The court seeks only to secure obedience to its prior order. Since the contempt order is coercive rather than punitive, the civil contemnor must be provided with the 'keys to his cell.' That is, he must be allowed to purge himself of contempt even after he has been imprisoned." *In re Marriage of Logston*, 103 Ill. 2d 266, 289 (1984).

¶ 57    In the case at bar, the trial court's order granting count I of Roy's petition, which was for visitation abuse, in part, stated:

>        "a. Petitioner, Mary Beth Knoll f/k/a Mary Beth Hickey Coyne, is hereby found and declared to be in indirect civil contempt of Court for her willful failure to obey the Court's Order as herein stated and for visitation abuse for the time period of June 13 and 14, 2014;

>        b. The parties shall immediately determine a make-up parenting time schedule for the parenting time missed by Respondent, Roy James Coyne, for the periods of June 13 through June 14, 2014 and the days that Roy missed parenting time during [the child's] 2013 Winter Break, pursuant to Paragraph 3.4 of the parties' Judgment for Dissolution of Marriage entered on April 17, 2003."

Mary Beth argues that that the order "neither uses the word 'purge' nor otherwise sets forth the conditions upon which Mary Beth may dissolve the indirect civil contempt" and, accordingly, does not constitute a valid civil contempt order. Roy, by contrast, argues that the order for makeup visitation operates as a purge provision. We agree with Mary Beth.

¶ 58    "A valid contempt order must contain a purge provision, which lifts the sanction when the contemnor complies with the order. [Citation.] A civil contempt order that fails to provide the contemnor with the 'keys to his cell' is void." *Bank of America, N.A. v. Freed*, 2012 IL App (1st) 113178, ¶ 42. In the case at bar, the order does not provide for any way for Mary Beth to purge her civil contempt; it does not say that the civil contempt will be purged through makeup visitation, as Roy attempts to argue. Furthermore, even the makeup visitation provision would not provide Mary Beth with the "keys to her cell," as it specifies that "[t]he parties shall immediately determine a make-up parenting time schedule." Thus, Roy's participation is a necessary prerequisite to establishing a makeup parenting time schedule. We have found that it is not a proper purge provision where the provision requires action by a third party to be effective. See *Bank of America*, 2012 IL App (1st) 113178, ¶ 44 (finding a purge provision invalid where it contained a requirement that a receiver make a recommendation to the court regarding the collection, sale, and distribution of the defendants' assets and noting that "[t]hese provisions appear to take the keys out of the defendants' hands and give them to the receiver, for even if defendants cooperate with the receiver, the contempt will not be purged until the receiver determines that his investigation is complete and makes a report and recommendation to the court"). Here, even if Mary Beth reached out to establish a makeup schedule, Roy could single-handedly prevent such a schedule through his conduct. Thus, even if it could be considered to be a purge provision, it would not be a proper one. Accordingly, the civil contempt finding must be vacated.

¶ 59    As an aside, although the parties do not discuss the issue, we must note that the court's contempt order in the instant case could also be arguably characterized as criminal contempt in addition to civil contempt. While civil contempt is designed to compel compliance with a court order, "criminal contempt is 'instituted to punish, as opposed to coerce, a contemnor for past contumacious conduct.' " *Emery v. Northeast Illinois Regional Transportation Co.*, 374 Ill.

App. 3d 974, 977 (2007) (quoting *In re Marriage of Sharp*, 369 Ill. App. 3d 271, 279 (2006)). " 'Criminal sanctions are retrospective in that they seek to punish a contemnor for past acts that he cannot now undo.' " *Emery*, 374 Ill. App. 3d at 977 (quoting *Sharp*, 369 Ill. App. 3d at 279). Here, the court found Mary Beth in contempt for denying Roy visitation on June 13 and 14, 2014, an action which cannot be undone. Thus, the court's contempt finding could have been arguably characterized as a criminal contempt finding, in addition to a civil one. This does not salvage the court's order, however, because, as we discussed in our jurisdictional analysis, the trial court did not impose a punishment and only ordered makeup visitation. Thus, Mary Beth was not "punished" in any way other than being found in contempt. Moreover, in a criminal contempt proceeding, the contemnor is entitled to similar constitutional protections and procedural rights as in other criminal proceedings. *People v. Budzynski*, 333 Ill. App. 3d 433, 438-39 (2002). "The defendant in an indirect criminal contempt action has a right to be charged by written complaint, petition, or information; a right to personal service; a right to file an answer; a right to be heard; a right to present evidence; a right to cross-examine witnesses; a right to subpoena witnesses; a right to a public hearing; a right to the privilege against self-incrimination; a right to counsel and the appointment of counsel if indigent; and a right to be proved guilty beyond a reasonable doubt." *Budzynski*, 333 Ill. App. 3d at 439 (citing *In re Marriage of Betts*, 200 Ill. App. 3d 26, 53-34 (1990)). Additionally, the contemnor may move for a substitution of judge and, if the potential penalty may exceed six months' incarceration or a fine of $500, the contemnor is entitled to a trial by jury. *SKS & Associates, Inc. v. Dart*, 2012 IL App (1st) 103504, ¶ 21. Furthermore, "[t]he alleged contemnor cannot assert these rights unless he receives proper notice of the nature of the charges against him. Accordingly, any party wishing to initiate indirect criminal contempt proceedings must not only notify the alleged contemnor that sanctions are being sought, but that the proceedings were criminal in nature." *People v. Goleash*, 311 Ill. App. 3d 949, 957 (2000). "Unless a contemnor is notified *in advance* of the nature of the charge, the contemnor would be impermissibly precluded from asserting her due process rights and certainly could not knowingly waive such rights." (Emphasis in original.) *In re J.L.D.*, 178 Ill. App. 3d 1025, 1031 (1989) (finding that "the failure of the trial court to advise respondent of the nature of the proceedings" was reversible error). See also *People v. Covington*, 395 Ill. App. 3d 996, 1009 (2009) (finding the trial court erred in entering a criminal contempt judgment against the defendant without providing the necessary criminal procedural rights where "at no point during the indirect criminal contempt proceeding was defendant admonished of his right to counsel"). Since Mary Beth was not admonished of these rights, a criminal contempt finding could not be valid.

¶ 60    Nevertheless, vacating the finding of civil contempt is not the end of the appeal. "As a reviewing court, we can sustain the decision of a lower court on any grounds which are called for by the record, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's reasoning was correct." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995). In the case at bar, the trial court's order found both that Mary Beth was in indirect civil contempt and that she had engaged in visitation abuse for the time period of June 13 and 14, 2014.[4]

---

[4]Indeed, we note that count I of Roy's petition was expressly for visitation abuse and sought a civil contempt finding as a remedy for the visitation abuse.

¶ 61 "Section 607.1 [of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/607.1 (West 2012))] provides a party an alternative remedy to seek enforcement of court-ordered visitation that is separate and apart from the trial court's contempt power." *Charous*, 368 Ill. App. 3d at 114. Under section 607.1, "[v]isitation abuse occurs when a party has willfully and without justification: (1) denied another party visitation as set forth by the court; or (2) exercised his or her visitation rights in a manner that is harmful to the child or child's custodian." 750 ILCS 5/607.1(a) (West 2012). "A trial court's finding that a party committed visitation abuse will not be disturbed unless it is against the manifest weight of the evidence." *Charous*, 368 Ill. App. 3d at 114 (citing *In re Marriage of Aleshire*, 273 Ill. App. 3d 81, 83 (1995)). As noted, "[a] decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." (Internal quotation marks omitted.) *Demaret*, 2012 IL App (1st) 111916, ¶ 43.

¶ 62 In the case at bar, as we have discussed above, the trial court's finding that Mary Beth had willfully denied Roy his visitation rights on June 13 and 14, 2014, was not against the manifest weight of the evidence. The same reasoning set forth in our discussion concerning the civil contempt finding applies here, as both require the finding of a willful denial of visitation. See *Charous*, 368 Ill. App. 3d at 114 (referring to its reasoning on contempt issue in determining whether visitation abuse had occurred). Thus, we affirm the trial court's judgment finding that Mary Beth engaged in visitation abuse on June 13 and 14, 2014.

¶ 63 "Upon a finding of visitation abuse, a trial court is authorized to (1) modify the visitation order; (2) order supervised visitation with a third party or public agency; (3) order makeup visitation; (4) order the parties to participate in counseling and mediation; and (5) order other appropriate relief deemed equitable." *Charous*, 368 Ill. App. 3d at 114; 750 ILCS 5/607.1(c) (West 2012). In the case at bar, the trial court ordered makeup visitation for the periods of time in which Roy was unable to exercise his parenting time, a remedy that is expressly authorized by statute. Accordingly, we affirm the trial court's judgment.

¶ 64                                     C. Makeup Parenting Time

¶ 65 Mary Beth's final argument is that, to the extent that Roy was entitled to makeup parenting time, he had already received it. Mary Beth argues that she agreed to give Roy additional visitation on over 20 occasions after January 2, 2014, which satisfied any makeup time to which he was entitled. Roy admits that Mary Beth allowed him additional parenting time for Blackhawks games and other such events, but argues that this was not a substitute for the visitation to which he was entitled under the parenting agreement, especially since he was entitled to overnight visitation on the days he missed.

¶ 66 We agree with Roy that the kind of visitation permitted makes a difference in determining whether there has been makeup time. For instance, in permitting an award of makeup time for visitation abuse, section 607.1 of the Act notes that it should be "[m]ake up visitation of the same time period, such as weekend for weekend, holiday for holiday." 750 ILCS 5/607.1(c)(3) (West 2012). Additionally, Mary Beth raised the additional visitation times before the trial court, and the trial court was aware of all of the evidence of visitation. We will not second-guess the trial court's factual determination that the additional visits permitted by Mary Beth did not constitute makeup time for the times that Roy missed. Accordingly, we affirm the trial court's judgment on the makeup visitation, but, as noted, on the basis of visitation abuse

- 17 -

instead of civil contempt.

¶ 67                                    II. Roy's Cross-Appeal

¶ 68        In his cross-appeal, Roy argues that "[t]he trial court erred in denying certain relief to" him. Roy argues that the trial court's finding that Roy did not miss any summer visitation was against the manifest weight of the evidence because Roy was prevented from taking the child out of state, as he had wished to do, and "there is authority in Illinois that overscheduling the child can be contempt of court and visitation abuse." Roy also claims that Mary Beth "engaged in other contemptuous conduct" and proceeds to list a page and a half of her alleged misdeeds.

¶ 69        We agree with Mary Beth that Roy's cross-appeal is seriously deficient. His arguments are undeveloped and have only one citation to authority, a case which does not support his argument.[5] "This court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research." (Internal quotation marks omitted.) *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). Since the deficiencies in Roy's brief render us unable to understand the arguments he wishes to raise on appeal or the basis for those arguments, we dismiss Roy's cross-appeal. See Ill. S. Ct. R. 341(h)(7) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 70                                         CONCLUSION

¶ 71        For the reasons set forth above, we cannot find that the trial court's finding that Mary Beth willfully denied Roy visitation on June 13 and 14, 2014, to be against the manifest weight of the evidence. We vacate the portion of the order finding her in civil contempt of court, but affirm the finding that she engaged in visitation abuse. We further affirm the trial court's order of makeup visitation. Roy's cross-appeal is dismissed for lack of compliance with Illinois Supreme Court Rules.

¶ 72        Civil contempt judgment vacated; judgment affirmed in all other respects.

---

[5] Roy cites *Charous* in support of his statement that "there is authority in Illinois that overscheduling the child can be contempt of court and visitation abuse." However, in *Charous*, it was the mother's use of the children's schedules as an excuse, not the activities themselves, that served as the basis for the contempt and visitation abuse findings. See *Charous*, 368 Ill. App. 3d at 111 (rejecting the mother's assertions that the children's extracurricular activities justified her noncompliance with the visitation provisions of the parenting agreement).