2021 IL App (2d) 190920-U
No. 2-19-0920
Order filed April 9, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* Marriage of<br>KENNETH R. BALDRIDGE, | ) <br>) <br>) | Appeal from the Circuit Court<br>of Du Page County. |
| Petitioner-Appellee, | ) <br>) | |
| and | ) <br>) | No. 17-CM-109 |
| GRETA J. BALDRIDGE, | ) <br>) <br>) | Honorable<br>Linda E. Davenport, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justice Jorgensen concurred in the judgment.
Justice McLaren specially concurred.

**ORDER**

¶ 1    *Held*:    Trial court's finding of contempt failed to include a purge provision and must be vacated, but remaining rulings were not against the manifest weight of the evidence. Appellant did not establish that case should be remanded to different judge.

¶ 2    The appellant, Greta Baldridge, contends that the trial court erred by finding that she had violated a parenting time order and finding her in contempt of court on June 27, 2018 (findings that were repeated in a modified order entered on July 1, 2018), and by denying her motion for reconsideration. We affirm in part and vacate the orders in part, and remand.

¶ 3                                    I. BACKGROUND

¶ 4       The parties' minor child, M., was born on May 6, 2006. A few years after that, the parties sought to dissolve their marriage. A joint parenting agreement (JPA) was entered in August 2009, under which the parties shared joint legal custody, M. resided with Greta, and Kenneth had visitation every weekend. A year later, a judgment of dissolution incorporating the JPA was entered. In 2015, after a hearing on both parties' petitions to reallocate parenting responsibilities, the trial court found that there had been a substantial change of circumstances since the entry of the JPA, in that M. was now attending school and had been diagnosed with ADHD and impulse control disorder that required counseling, medication, and the implementation of an individualized educational plan. It further found that the parties' relationship was too uncooperative and combative to permit the continuation of joint parenting. The trial court entered a new parenting order that awarded sole primary parenting responsibility to Greta and gave Kenneth parenting time on alternating weekends and a midweek afternoon.

¶ 5       In the summer of 2018, M. (who was then 12 years old) returned from visiting Kenneth in Florida. On August 8, 2018, Greta filed an emergency motion. The motion alleged that Kenneth had: threatened, screamed at, grabbed, and shaken M.; failed to provide Greta with his address in Florida or an itinerary for M.'s stay in Florida; told M. that he would beat her with a belt if she gave her mother Kenneth's address in Florida; and refused to allow M. to call Greta during the visit. The motion alleged that M. was afraid that Kenneth would kidnap her, was afraid of him overall, and did not want to have visits with him. At a later hearing, Greta testified that the emergency motion was based on M.'s account of things that had happened during her parenting time with Kenneth. The motion sought the reappointment of the guardian *ad litem* (GAL) to investigate the allegations, a suspension of Kenneth's parenting time until the GAL's report was issued, and the modification of the parental allocation judgment as appropriate in M.'s best

interests. The motion was heard the next day. The trial court entered an order reappointing the GAL "for the limited purpose of conducting a preliminary investigation" and suspending Kenneth's visit on the upcoming weekend. The court set the case for status on August 15, 2018.

¶ 6    On August 15, the parties and the GAL appeared in court. The trial court entered an order providing for the execution of releases, access to medical and counseling records, and the identification of a new counselor for M. The order also reinstated some parenting time for Kenneth, providing that he could visit with M. in public places on alternate weekends from 11 a.m. to 1 p.m. on Saturdays and Sundays. However, Kenneth would not have overnights with M. or parenting time in Florida until further order of court. M. was to have her phone with her at all times, and when M. was with Greta, M. was to call or text her father daily at a set time. M. could not contact her mother when she was with Kenneth, but if there was an emergency she could contact the GAL.

¶ 7    On August 24, 2018, the trial court held another status hearing. M. was brought to court for an *in camera* interview with the trial court, another judge, and the GAL. In the interview, M. told the trial court that her father was not nice to her. She said that he had locked her in the basement with the lights off when she was five years old. (This allegation was investigated when M. was younger and was discredited.) In the present, Kenneth screamed at her. The last time that happened was during a parent pickup at a McDonald's sometime earlier that summer. She told him that she did not want to go with him and walked off. He chased her, and she ran to her mother's car and got in and locked the doors. Everyone ended up driving to the police station.

¶ 8    M. said that her father scared her. During a recent visit at the mall, her father tried to call her repeatedly but M. was not answering her phone as the ringer was off. Her father tracked her location through her phone, and was angry when he found her, yelling at her that she was a "bad

kid." M. was scared by her father's yelling and also scared by learning that he could track her through her phone. Kenneth then held her neck and pushed her on the way to the car. She did not like him to know where she was because she was afraid he would hurt her.

¶ 9     M. said that, at Christmas, Kenneth hurt his then-wife Parisa (whom he had married after his divorce from Greta). M. described her father as "punching [Parisa] and shoving her and punching her and hurting her," and then he pushed and shoved Parisa and threw her against a wall. Kenneth gave M. a time-out when she told him that she did not like the way he had treated Parisa. When M. repeated her statement after the time-out, Kenneth threatened to whip her with a belt. M. said that her father had never actually hit her with a belt, but he got a belt when he chastised M. and so M. became scared and decided to apologize and tell him that he was right so that he would not hurt her.

¶ 10     M. talked about the dogs at Kenneth's house. She said that, when the dogs got nervous and sometimes peed, her father would "hit them and hit them and hit them really hard," and if they squealed or got hurt he would hit them more. She did not tell anyone because she was scared that Kenneth would try to hurt her or her mother. The trial court asked M. if Kenneth had ever hurt Greta. M. said that she did not know but she would bet he had, maybe before she was born, because of what happened with Parisa, and with Sandra and her daughter. Sandra was her father's current girlfriend. When M. was in Florida, Sandra's daughter told M. that she had seen them "wrestling," and on one occasion M. saw Kenneth angry and "pushing Sandra around."

¶ 11     The trial court asked if M. talked with Greta about what was going on. M. said that she was scared that her father might hurt her and so she had told her mother not to tell anybody. Asked if, apart from grabbing her by the neck in the mall and locking her in the basement when she was five, her father had ever hurt her, M. said that he had hit her. It happened when they were in a car

near a pizza restaurant. M. had bought something without permission and Kenneth was angry. He made her face him and look into his eyes, and then he slapped her face and told her not to buy anything without permission.

¶ 12 Kenneth had been mad at her ever since she ran away during the scheduled pick-up last summer. He yelled and screamed at her, and grabbed her and set her on a cabinet, and told her she was a bad person if she told him that she did not want to talk to him. When the trial court told M. that she would need to spend time with her father, she began crying hysterically, saying that her father would hurt her. The trial court told her that it could make sure that Kenneth would not hurt her or her mother, but she did not have a choice; she would need to see her father. Kenneth would not hurt her or touch her, and he would need to listen to her, but they would have to spend time together. Kenneth's visits with M. commenced the next day.

¶ 13 Kenneth had parenting time with M. on August 25, September 29, September 30, and October 13, 2018. The parenting times did not go well. M. refused to interact with her father, and ran away from him and sought the assistance of strangers, telling them that Kenneth was going to "get her" and that she was afraid of him. She was often crying or hysterical on these occasions. On October 18, the GAL filed a motion to suspend parenting time until the trial court could determine whether parenting time was in M.'s best interests. After Kenneth agreed to suspend his parenting time and the trial court appointed certain experts, the GAL withdrew her motion.

¶ 14 In November 2018, Kenneth filed two items. The first was a motion to vacate the August 15, 2018, order. Kenneth argued that the order improperly restricted his parenting time without any finding that he posed a substantial danger to M.'s well-being as required under section 603.10(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/603.10(a)

(West 2016)). The trial court granted this motion in February 2019, finding that it had failed to make the requisite finding, and vacating the order in its entirety.

¶ 15    Kenneth also filed a petition under section 607.5 of the Act (750 ILCS 5/607.5 (West 2016)) that sought to enforce his parenting time and also sought a finding that Greta had engaged in parenting time abuse. Kenneth alleged that M.'s actions during the four recent parenting times essentially deprived him of any meaningful time with her. He alleged that Greta had "encouraged if not directed" M. to act out during parenting time with Kenneth and that she had coached M. to make false allegations of abuse. Kenneth also made a host of specific allegations, including that Greta had interfered with his parenting time by arriving late to visits, attempting to communicate with M. during visits, showing M. documents from Kenneth's divorce proceeding with Parisa, and discussing that case with M. in order to instill fear in her. Kenneth's petition also alleged that M. did not initiate calls or texts to him as required in the order, and she would not answer the phone if he called. If he texted, M. sent him only a brief message that she was fine; she would not answer questions or engage in conversation. Greta disputed these allegations and argued that she brought M. to each parenting time and urged M. to see her father, but ultimately she could not control M.'s actions when M. was with Kenneth.

¶ 16    Over the course of four days in January and June 2019, the trial court heard evidence from the parties, the GAL, and Greta's boyfriend. At times, the trial court limited the evidence to the allegations of Kenneth's petition, while at other times the court heard evidence on related matters such as the allegations of Greta's August 2018 petition.

¶ 17    On June 27, 2019, at the close of the hearing, the trial court granted Kenneth's petition. It found by a preponderance of the evidence that Greta had not complied with allocated parenting time in accordance with an approved parenting plan or prior court order, and also made an

unspecified "finding of contempt of court." Explaining its ruling, the trial court did not mention any of the specific acts alleged by Kenneth. Rather, the trial court found that Greta's refusal to punish M. for her misconduct during parenting time with Kenneth, and Greta's failure to reassure M. that Kenneth would not hurt her, amounted to a tacit approval and encouragement of M.'s fears and misconduct. The trial court did not identify any specific provision of any parenting order that this conduct violated or explicitly address whether there was good cause for Greta's conduct.

¶ 18    The trial court awarded Kenneth more than three weeks of "make-up" parenting time in Florida, to begin that same day. The trial court then imposed several sanctions under section 607.5, fining Greta $400 ($100 for each instance of parenting time in which M. acted out), requiring Greta to post a $10,000 bond, finding that she had committed the petty offense of abuse of parenting time and fining her $500 for that offense, suspending her driver's license, and requiring her to pay Kenneth's attorney fees. The trial court did not identify any of these sanctions as a method by which Greta could purge the finding of contempt.

¶ 19    The next day, the trial court *sua sponte* reconsidered and modified its order, vacating or modifying several of the sanctions against Greta. The provisions that remained included the findings that Greta was in contempt of court and was guilty of a petty offense, the $500 fine for that offense, and the requirements that she post a lower bond ($1000 instead of $10,000) and pay Kenneth's attorney fees. The modified order still did not identify any means by which Greta could purge the finding of contempt.

¶ 20    Greta filed a motion to reconsider, arguing among other things that the finding of contempt was not proper because neither the June 27 nor July 1, 2019, order identified any means of purging the contempt, and arguing that there was no basis for that finding because the trial court did not identify any provision of the August 15, 2018, order that she violated. The trial court denied the

motion, saying that the obligation of "getting a child ready" for parenting time included the "obligation to prepare the child and to encourage the child and to make that child ready" to enjoy parenting time with the other parent, and Greta had not made any efforts to fulfill that obligation. This appeal followed.

¶ 21                                    II. ANALYSIS

¶ 22                                 A. Contempt Finding

¶ 23    On appeal, Greta attacks the trial court's orders finding her in contempt of court and imposing penalties, and denying her motion for reconsideration. She raises a host of arguments, most of which we do not reach because we find one to be dispositive: the argument that the trial court erred as a matter of law by finding Greta in contempt and imposing penalties without identifying any means for Greta to purge herself of contempt.

¶ 24    "A court is vested with inherent power to enforce its orders and preserve its dignity by the use of contempt proceedings." *People v. Warren*, 173 Ill. 2d 348, 368 (1996). Civil contempt occurs when a party willfully fails to comply with a court order. *In re Marriage of Knoll & Coyne*, 2016 IL App (1st) 152494, ¶ 50. The noncompliance is classified as indirect civil contempt when it occurs outside the presence of the court. *Id.* "The burden initially falls on the petitioner to establish, by a preponderance of the evidence, that the alleged contemnor has violated a court order. [Citation.] Once that burden is satisfied, the burden shifts to the contemnor, who has the burden of showing that the violation was not willful and contumacious and that he or she had a valid excuse for failing to follow the order." *Id.* "Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court should not disturb the trial court's determination unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion." *In re Marriage of McCormick,* 2013 IL App (2d) 120100, ¶ 17. An abuse of

discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court, or when the ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11. Here, the trial court's failure to identify a means by which Greta could purge herself of contempt was an error of law.

¶ 25 "Civil contempt is a sanction or penalty designed to compel future compliance with a court order" (*Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007), quoting *Warren*, 173 Ill. 2d at 368), and thus it "involves a coercive sanction rather than a punishment for past contumacious conduct" (*In re A.M.*, 2020 IL App (4th) 190645, ¶ 15). "Civil contempt proceedings have two fundamental attributes: (1) [t]he contemnor must be capable of taking the action sought to be coerced and (2) no further contempt sanction" can be imposed once the contemnor has complied with the pertinent court order. *Id.* (quoting *In re Marriage of Betts*, 200 Ill. App. 3d 26, 44 (1990)). Thus, the contemnor must be given the opportunity to purge herself of contempt by complying with the court order.[1] *Id.*; see also *Felzak*, 226 Ill. 2d at 391 ("a valid purge condition is a necessary part of an indirect civil contempt order"). A civil contempt order that does not provide the contemnor with

---

[1] We note that here the trial court's finding of contempt was made pursuant to section 607.5(c)(7) of the Act, which permits a court to make such a finding if the preponderance of the evidence shows a parent's noncompliance with a parenting time order. Thus, the contempt finding was in some sense statutory in nature. However, the ordinary principles of contempt still apply. *A.M.*, 2020 IL App (4th) 190645, ¶ 21 ("when including a finding of contempt within an order on a petition for the enforcement of parenting time, a court must necessarily comply with the requirements for contempt—direct and indirect, civil and criminal—as they are commonly understood and set forth in well-established case authority").

the "keys to his cell"—that is, a readily identifiable means of purging the finding of contempt—is invalid and must be vacated. *Id.* ¶ 29 (contempt order's failure to include a purge provision was "fatal"); *Knoll*, 2016 IL App (1st) 152494, ¶ 58.

¶ 26    Here, nothing in the trial court's rulings on either June 27 or the next day, when it modified those rulings, indicated any means by which Greta could purge herself of the trial court's finding of contempt. Accordingly, the finding of contempt was invalid and must be vacated. Our vacation of the contempt finding also has the effect of vacating the finding that Greta had committed a petty offense and the fine of $500, as those statutory remedies require a valid finding of contempt. See 750 ILCS 5/607.5(f) (2016) (listing additional orders that may be made if the trial court has issued an order holding a party in contempt for violating a parenting time order).

¶ 27    When Greta argued in her motion for reconsideration that the finding of contempt was invalid because there was no purge provision, the trial court rejected the argument, saying that Greta's payment of the $1,000 bond was designed to secure her compliance with the court order, and that this goal had been achieved in that M. had in fact spent three weeks in Florida with Kenneth.

¶ 28    This *post hoc* rationalization was not legally sound. A purge provision cannot function unless it is identifiable as such, because a contemnor does not have the "keys to her cell" unless she knows what she must do in order to purge the contempt. See *A.M.*, 2020 IL App (4th) 190645, ¶ 15; *Knoll*, 2016 IL App (1st) 152494, ¶ 58. Here, the order finding Greta in contempt and imposing the various penalties did not indicate any way in which she could purge the contempt. The trial court's later identification of the payment of the bond as a purge could not cure this defect after the fact, as the method for purging was not clear in the initial orders. (We also note that there was no prior court order granting Kenneth three weeks of "make-up" parenting time, and thus

Greta was not "complying" with a prior court order when she allowed that parenting time to occur. The parenting time that had been missed was due to Kenneth's voluntary suspension of visits; there was no finding or evidence that Greta had not made M. available for parenting time. Thus, we cannot trace any coercive effect from the trial court's orders.) The trial court's misrepresentations are regrettable. It should instead have simply acknowledged its error.

¶ 29          B. Finding of Parenting Time Violation and Remaining Penalties

¶ 30    Greta also argues that we should vacate the remaining penalties imposed by the trial court because there was insufficient evidence that she violated any provision of the August 15, 2018, order on which Kenneth's petition was based. However, we must defer to the trial court's findings of fact unless they are against the manifest weight of the evidence. *McCormick,* 2013 IL App (2d) 120100, ¶ 17. A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence. *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007).

¶ 31    We are troubled by certain aspects of the record, such as the trial court's failure to identify any specific provisions of any parenting time order that Greta had violated, its reliance instead on Greta's general duty as a parent to "prepare" M. for parenting time by reassuring her that Kenneth loved her and would not harm her, and the minimal consideration it seemed to accord to evidence from M.'s therapist and the GAL as well as from M. herself that M. had witnessed Kenneth become physically violent toward others when he was angry. One of the purposes of the Act is to "protect children from exposure to conflict and violence." 750 ILCS 5/102(4) (West 2016). Subjecting a child to "the witnessing of physical force against another" constitutes intimidation of a dependent (*id*. § 103(10)) and thus falls within the definition of "abuse" under the Act (*id*. § 103(1)). If

proven, such abuse is grounds for restricting the abusive parent's parenting time (see *id.* § 603.10(b)(2)), and could be considered in determining whether Greta's noncompliance with a parenting time order was willful or contumacious (see *In re Marriage of McCormick*, 2013 IL App (2d) 110894-U, ¶ 29). Thus, it behooved the trial court to take seriously the issue of whether M. witnessed such violence and to recognize the legal relevance of that issue.

¶ 32    Nevertheless, the record also contains evidence supporting the trial court's findings that Greta's conduct improperly amplified M.'s fears and was driven at least in part by her own antipathy toward Kenneth. Even if Greta's conduct did not violate any individual provision of the August 15, 2018, order, we note that trial courts have an obligation to act in a child's best interest (*id.* § 102(4), (7)), and the JPA entered in this case required both parents to "use all reasonable efforts to maintain free access and to create a feeling of affection between themselves and the minor child" and not "do anything to hamper the natural development of the child's love and respect for the other party" or "speak[] about the other parent in a disparaging manner either to or in the presence of the child." Accordingly, we cannot say that the trial court's finding that Greta's conduct interfered with Kenneth's parenting time was against the manifest weight of the evidence, that is, that the opposite conclusion was clearly evident or that the trial court's findings were unreasonable, arbitrary, and not based on any of the evidence. *Samour*, 224 Ill. 2d at 544. We therefore affirm the remaining portions of the trial court's orders, including the requirements that Greta post a bond and pay Kenneth's attorney fees.

¶ 33                C. Disqualification and Reassignment

¶ 34    Greta lastly argues that the orders should be set aside because the trial court's rulings improperly relied on extra-judicial "personal knowledge" of disputed facts with respect to an incident that occurred on August 24, 2018. Greta also asks us to order that the case be reassigned

to a different judge upon remand, an option that is permitted by Illinois Supreme Court Rule 366(a)(5) (Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994)). See *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002).

¶ 35 The "backpack incident" took place in a public hallway in the courthouse after M.'s *in camera* interview. Kenneth attempted to bring M.'s backpack to her and was told to put it on the ground instead. The trial judge apparently left the bench and witnessed the incident. The incident was not mentioned in Kenneth's petition to enforce parenting time. Accordingly, when Kenneth began to testify about the incident at trial, Greta objected. However, the trial court overruled the objection.

¶ 36 The evidence regarding the incident was disputed. Kenneth testified that Greta told him to set the backpack on the floor and back away, while Greta denied this and testified that it was M. who told Kenneth to put the backpack down, because she became frightened when they got off the elevator and there was a crowd of people there. When ruling on Kenneth's petition, the trial court referred to her personal recollection of the incident, in essence acting as a witness regarding the event: "As to the backpack, I was there. You sheltered your daughter as if she was in danger when there were deputies around. Nothing was happening. You never even opened your mouth to say, [M.], take the bag from your dad, it's okay. You did nothing." The trial judge cited her own impressions of the incident as one basis for her finding that Greta had violated a parenting time order and her decision to grant Kenneth's petition.

¶ 37 Greta argues that the trial judge's "testimony" about an incident that occurred outside the courtroom, and her reliance on her personal recollection of that incident, violated Canon 3 of the Code of Judicial Conduct. As relevant here, that canon requires a judge to disqualify herself in any proceeding in which her "impartiality might reasonably be questioned," including where the

judge has "personal knowledge of disputed evidentiary facts concerning the proceeding" or where the judge may be "a material witness in the proceeding." Ill. S. Ct. R. 63(C)(1)(a), (e)(iv) (eff. Feb. 2, 2017). Greta argues that the trial court violated these ethical rules and should have disqualified herself from deciding the dispute.

¶ 38 This argument has some substance. A judge must take care to maintain a fair and impartial approach to every matter that comes before her, and she "may never depart from [her] function as judge and assume the role of an advocate." *People v. Kuntz*, 239 Ill. App. 3d 587, 591-92 (1993). In fact, the possibility of a judge providing material testimony in a matter is serious enough that it is grounds for an automatic substitution of judge. See 735 ILCS 5/2-1001(a)(1) (West 2018).

¶ 39 Moreover, a judge may not rely on matters outside the record, such as her own personal knowledge, in deciding a matter of disputed fact. "A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence[,] constitutes a denial of due process of law." *People v. Wallenberg*, 24 Ill. 2d 350 (1962); see also *People v. Harris*, 57 Ill. 2d 228, 231 (1974) ("a trial judge in [her] deliberations is limited to the record made before [her] at trial," and reliance on personal knowledge of disputed events denies the parties due process of law). In a bench trial, there is a general presumption that the trial judge considered only the evidence properly of record in making her determinations. *Harris*, 57 Ill. 2d at 213. However, statements by a judge showing that she relied on matters that were not in evidence "necessarily rebuts this presumption." *Wallenberg*, 24 Ill. 2d at 354. *Cf. People v. Dameron*, 196 Ill. 2d 156, 179 (2001) (just as with a jury, in a bench trial the judge may not consider matters outside the evidence presented to it, and the consideration of "unauthorized information" is prejudicial error).

¶ 40    Kenneth argues that Greta forfeited this argument because she did not raise it in the trial court—she did not raise the issue in her motion to reconsider, and she did not request that the trial judge recuse herself or file a petition for substitution of judge pursuant to section 2-1001(a) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1001(a) (West 2018)).  We noted that Kenneth did not cite any legal authority in making this argument, and thus himself could be considered to have forfeited his forfeiture argument.  See Ill. S. Ct. R. 341(h) )(7) (eff. May 25, 2018).  Nevertheless, he is correct that, as a general rule, reviewing courts will not consider arguments not raised in the trial court.  *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 127 (2010).  This rule encourages parties to raise issues before the trial court, thereby allowing the court to correct its own errors.  *People v. Herron*, 215 Ill. 2d 167, 175 (2005).

¶ 41    "However, this rule is an admonition to the parties and not a limitation on a court of review.  Reviewing courts may look beyond considerations of forfeiture to maintain a sound and uniform body of precedent or where the interests of justice so require."  *People v. Jackson*, 2020 IL 124112, ¶ 118.  In this case, the potential impropriety of a trial judge acting as a witness in her own hearing is sufficiently substantial that we prefer to overlook Greta's forfeiture and address the issue on its merits.  Moreover, Greta has also requested that we order the case to be reassigned to a different judge upon remand.  This request, which involves some of the same legal considerations, is made pursuant to the rules of appellate procedure.  Thus, it is not subject to forfeiture for failure to raise it before the trial court.

¶ 42    Here, the trial judge decided to place her own observations of an incident that took place outside the courtroom into the record and to rely upon them in making her ruling.  This conduct, which was ill-advised and wholly unnecessary, showed scant concern for the judge's ethical obligations to maintain impartiality and avoid direct involvement in a case pending before her.

However, Canon 3 requires a judge to disqualify herself if she may be a "material" witness. Ill. S. Ct. R. 63(C)(1) (e)(iv) (eff. Feb. 2, 2017). Similarly, a party seeking the substitution of a judge for cause must show actual prejudice from the judge's conduct. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 30. Thus, to justify removing a judge from a case or vacating her rulings entirely, we must consider not only whether there was improper conduct but also the effect of that conduct. We therefore examine the extent to which the trial judge relied on her personal knowledge in the context of the substantial amount of other evidence presented here, and whether the trial judge's statements regarding the disputed incident constituted testimony "material" to her ultimate decision to grant Kenneth's petition. See Ill. S. Ct. R. 63(C)(1)(e)(iv) (eff. Feb. 2, 2017); 735 ILCS 5/2-1001(a)(1) (West 2018).

¶ 43    In *Wallenberg*, the trial judge had found the defendant guilty after a bench trial. Relying on his own personal knowledge, the judge had rejected the defendant's alibi testimony that he did not stop to fix a flat tire until he reached a certain location because there were no gas stations where he could get air for his tire along that route. See *Wallenberg*, 24 Ill. 2d at 354 (when finding defendant guilty, trial judge stated that he "happen[ed] to know different" and therefore did not believe the defendant). The supreme court reversed the conviction. It noted that, although a trial judge is presumed to have considered only the evidence properly in the record, the trial judge's statements rebutted that presumption. *Id.* The trial judge's statements here were similar to those in *Wallenberg* and, given that she made her statements when ruling at the close of a four-day trial, it is possible that she improperly relied on her own perception of the backpack incident not only to decide what actually happened in that one incident but also in deciding whether to grant Kenneth's petition as a whole. Canon 3 teaches that, if a trial judge feels that her own observations about a disputed event that occurs outside the courtroom are essential to the resolution of an issue,

she should recuse herself from hearing the dispute. Ill. S. Ct. R. 63(C)(1)(e)(iv) (eff. Feb. 2, 2017). Otherwise, she must refrain from relying on her own recollection of the event or fact. *Wallenberg*, 24 Ill. 2d at 354.

¶ 44    Nevertheless, this case differs from *Wallenberg* in an important respect.  In *Wallenberg*, the only evidence in the record on the factual issue of whether there were gas stations with air pumps along a particular route was the defendant's testimony—there was no contrary evidence. Thus, the trial judge in *Wallenberg* essentially supplied the factual basis for his decision from his own "personal knowledge," in direct contradiction to the unrebutted testimony of the defendant. This inescapably required the reversal of the defendant's conviction.  Here, by contrast, although the trial judge explicitly relied upon her personal recollection of the backpack incident, there was a voluminous record that contained ample other testimony about Greta's actions with respect to the interactions between M. and Kenneth.  Thus, the prejudice flowing from the judge's use of her "personal knowledge" is less in this case than in *Wallenberg*.  Indeed, given the wealth of evidence before the judge, it is likely that she could have reached the same decision without relying at all on her own recollection about the backpack incident.  Greta has not shown actual prejudice, that is, that the trial judge's injection of her "personal knowledge" regarding the backpack incident so infected her rulings that they cannot stand.  We therefore decline to vacate the June 27 and July 1, 2018, orders in their entirety.

¶ 45    We reach a similar result with respect to Greta's request that the case be reassigned to another judge upon remand.  The party challenging a judge's impartiality must present specific "evidence of prejudicial trial conduct and evidence of the judge's personal bias."  *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002).  "Judges *** are presumed impartial, and the burden of

overcoming the presumption by showing prejudicial trial conduct or personal bias rests on the party making the charge." *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 31.

¶ 46    Here, apart from noting the trial judge's consideration of her personal knowledge concerning the backpack incident, Greta has not identified any specific evidentiary rulings or other errors that she claims show bias. Without such specifics, she has not carried her burden, as bias cannot be presumed from the fact that the trial court ruled in favor of Kenneth. See *id*. ("Allegedly erroneous findings and rulings by the trial court are insufficient reasons to believe that the court has a personal bias for or against a litigant."). We therefore deny Greta's request that we order reassignment of the case.

¶ 47                            III. CONCLUSION

¶ 48    For the reasons stated, the judgment of the circuit court of Du Page County is affirmed in part and vacated in part. Specifically, the finding of contempt contained in the trial court's rulings on June 27, 2018, and the order entered on July 1, 2018, is vacated, as is the finding that Greta committed a petty offense and the related fine of $500. The remaining rulings are affirmed. The matter is remanded for further proceedings consistent with this decision.

¶ 49    Affirmed in part and vacated in part; cause remanded.

¶ 50    JUSTICE McLAREN, specially concurring:

¶ 51    I specially concur because, although I agree with the result, I wish to distance myself from the analysis regarding "C. Disqualification and Reassignment".

¶ 52    I believe the record is insufficient to fully cover and analyze the claim of error. The appellant has not provided us with a transcript, bystander's report or stipulated statement of facts for us to determine if the claim that the judge was a witness and violated the canon of ethics is meritorious. The incident happened in the courthouse outside the courtroom. The appellant was

either aware the judge was present during the incident or learned of her presence during the hearing. The appellant failed to raise the claim of error or provide the opportunity for the issue to be properly preserved and perfected for our full consideration. (Whether the appellee forfeited his claim of forfeiture by failing to cite to authority does not alter the fact that the appellant failed to provide a sufficient record for us to *audi alteram partem* (hear the other side).)

> "[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391–92 (1984).

¶ 53    The failure to provide the opportunity to address the issue below is called a "procedural default."

> " 'The rule of invited error or acquiescence is a procedural default sometimes described as estoppel.' *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). A party cannot complain of error to which it consented, as it would be manifestly unfair to allow a party a second trial based on error which that party injected into the proceedings. *Id*. The rationale behind the rule is to prevent a defendant from inducing the trial court to proceed in a particular manner at trial and then later using that as a basis to secure reversal on appeal. *Id*." *People v. Williams,* 2021 IL App (2d) 190276-U, ¶ 96.

¶ 54    Considering the tempestuous nature of the proceedings, I am reticent to make a qualitative judgment on the claimed error here.