NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 221003-U

NO. 4-22-1003

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 19, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* PARENTAGE OF | ) | Appeal from the |
| C.H.P., a Minor | ) | Circuit Court of |
| | ) | Carroll County |
| (Melissa S. A., Petitioner-Appellee | ) | No. 21F10 |
| v. | ) | |
| Cameron K. P., | ) | Honorable |
| Respondent-Appellant). | ) | Scott L. Brinkmeier, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Cavanagh and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed the trial court's judgment where the trial court's decision to grant Melissa's petition for modification of a shared parenting plan agreement was not against the manifest weight of the evidence. The appellate court held that the trial court's finding that Melissa did not willfully and contumaciously violate a court order by placing the parties' minor child in school was not against the manifest weight of the evidence.

¶ 2    Respondent, Cameron K. P., appeals the October 17, 2022, order of the circuit court of Carroll County granting petitioner Melissa S. A.'s petition to modify the allocation of parental responsibilities regarding their minor child, C.H.P. Cameron, who lives in Indiana, argues the court's decision granting Melissa primary parenting time and placing C.H.P. in kindergarten in Illinois was against the manifest weight of the evidence. Cameron also appeals the court's November 1, 2022, order denying his petition to hold Melissa in indirect civil contempt. We affirm.

¶ 3                              I. BACKGROUND

¶ 4                        A. The Ohio Proceedings

¶ 5        C.H.P. was born on July 4, 2015. The parties, who were never married, lived together until C.H.P. was three and a half years old. When the parties separated, they were living in Dayton, Ohio.

¶ 6        In March 2020, Cameron filed an action to establish paternity and for change of custody in the Common Pleas Court of Montgomery County, Ohio, Juvenile Division. On March 3, 2020, Cameron also filed the parties' agreement respecting parental rights and responsibilities (shared parenting plan agreement). Pertinent to this appeal, the parties agreed to share parenting time equally. They also stipulated that when C.H.P. reached school age, they would mutually agree upon which school district C.H.P. would attend, but, if they could not agree, they would allow the court to decide. The Ohio court set the matter for a pretrial hearing on June 30, 2020.

¶ 7        On April 24, 2020, Melissa filed a "Notice of Intent to Relocate," stating that she had "relocated from the State of Ohio to the State of Illinois effective 3/26/2020."

¶ 8        On June 30, 2020, the Ohio court dismissed Cameron's paternity complaint "as moot." On July 8, 2020, the court "adopted" and "incorporated" the shared parenting plan agreement as its final judgment.

¶ 9        On July 9, 2021, Cameron, who was then living in Indiana, filed a motion in Ohio to modify the shared parenting plan agreement. Cameron alleged that C.H.P. was ready for kindergarten but the parties could not agree on a school district. Cameron alleged that the district in Indiana where he lived offered a "better educational foundation" than the district where Melissa lived in Illinois. This motion to modify was initially set for a hearing on August 20, 2021, but was continued to September 8, 2021. Cameron testified at trial that he dismissed the motion in Ohio in October 2021, before the Ohio court ruled on it.

- 2 -

¶ 10                    B. The Illinois Proceedings

¶ 11              1. *The Ohio Judgment Was Enrolled in Illinois*

¶ 12        In March 2020, Melissa moved to the village of Milledgeville in Carroll County, Illinois. On August 3, 2021, upon Melissa's petition, the circuit court of Carroll County enrolled the Ohio judgment. On August 17, 2021, Cameron filed a motion to vacate the order enrolling the judgment, alleging that he was present in the courthouse when the August 3 order was entered, but a bailiff prevented him from entering the courtroom to contest Melissa's petition. On August 26, 2021, with the parties' agreement, the Illinois court vacated the August 3 order, allowed Cameron to file a response to Melissa's petition to enroll the Ohio judgment, and set the matter for a hearing on September 3, 2021.

¶ 13        At the September 3, 2021, hearing, both parties were represented by counsel. Melissa testified that there were no matters pending in Ohio when she filed her petition to enroll the judgment in Illinois. However, around July 27, 2021, she was served with a notice that Cameron had filed a petition in Ohio to modify the shared parenting plan agreement. Cameron testified that he moved to Marion, Indiana, in late April 2021. Melissa argued that Ohio no longer had jurisdiction, as neither party nor the child lived there. Melissa proposed that Cameron's petition to modify the shared parenting plan agreement be transferred to Illinois for resolution. (According to Cameron's testimony, he did not dismiss the Ohio petition in Ohio until October 2021.) Cameron opposed enrolling the Ohio judgment in Illinois on the ground that Melissa submitted herself to the jurisdiction of the Ohio court by signing the shared parenting plan agreement. The Illinois court continued the hearing on Melissa's petition to enroll the judgment to September 8, 2021, stating it wanted to read the relevant case law and converse with the Ohio

judge before making its decision. The record does not contain a report of proceedings of the September 8, 2021, hearing.

¶ 14 However, on October 14, 2021, the Illinois court again enrolled the Ohio judgment. That order reflects that the Illinois court heard evidence and participated in a telephone call with the Ohio judge. In the order, the trial court made the following findings: (1) Melissa and C.H.P. resided in Illinois, (2) Cameron and C.H.P. resided in Indiana, (3) neither party nor C.H.P. resided in Ohio, and (4) Illinois had jurisdiction of the subject matter and the parties. The record shows that Cameron did not pursue his July 9 Ohio petition to modify the shared parenting plan agreement after jurisdiction was transferred to Illinois. Rather, Cameron filed a new petition in Illinois on December 3, 2021.

¶ 15 2. *Both Parties Moved to Modify the Shared Parenting Plan Agreement*

¶ 16 On December 3, 2021, Melissa filed a petition to modify the shared parenting plan agreement, arguing that the parties' current arrangement was no longer workable. Melissa alleged three changes in circumstances: (1) Cameron moved to Indiana, (2) Melissa moved to Illinois, and (3) C.H.P. reached school age and began attending kindergarten in Milledgeville in August 2021. In a separate petition, also filed on December 3, 2021, Melissa requested that she be granted majority parenting time.

¶ 17 On December 3, 2021, Cameron filed a petition to hold Melissa in indirect civil contempt. Cameron contended that Melissa (1) had denied Cameron equal parenting time since August 14, 2021 and (2) enrolled C.H.P. in kindergarten in Milledgeville without Cameron's agreement and without a court order, in violation of the July 8, 2020, Ohio judgment. On December 3, 2021, Cameron also filed a petition asking for interim holiday and school-break parenting time. In a third filing on December 3, 2021, Cameron sought modification of the shared parenting plan

agreement, requesting majority parenting time and leave to enroll C.H.P. in kindergarten in Indiana.

¶ 18　　　　On December 17, 2021, the parties entered an agreed order regarding Cameron's holiday parenting time. The parties also agreed to mediate issues of parenting responsibilities and school placement. The record shows that the parties reached agreement on some, but not all, issues. The trial court appointed a guardian *ad litem* for C.H.P.

¶ 19　　　　3. *The Trial on the Parties' Petitions to Modify the Shared Parenting Plan*

*Agreement*

¶ 20　　　　The trial court conducted a trial on the parties' respective petitions to modify the shared parenting plan agreement on August 2, August 24, and September 13, 2022. The following evidence was adduced.

¶ 21　　　　　　　　　　a. Melissa's Evidence

¶ 22　　　　Kathy Skoog testified that she was C.H.P.'s kindergarten teacher in Milledgeville. Skoog testified that when C.H.P. started kindergarten in a class of 14 students, he suffered separation anxiety from his mother and was not happy attending school. However, according to Skoog, C.H.P. gradually adjusted and became a happy student. Skoog testified that over the school year, C.H.P. exhibited a "hundred percent turn-around from where we started." C.H.P. had no needs that the Milledgeville school could not meet. Skoog testified that C.H.P. had no behavioral or social issues. According to Skoog, Cameron participated in C.H.P.'s progress remotely via Zoom or Microsoft Teams.

¶ 23　　　　Kimberly S. Gebhardt testified that she worked with Melissa at the Milledgeville State Bank, where Melissa was a teller. Gebhardt described Melissa as a valued employee and a hard worker. According to Gebhardt, Melissa was attentive to C.H.P. and brought him to the bank

after school once for an hour when Melissa did not have after-school care for C.H.P. Gebhardt testified that C.H.P. was "very good" and "very happy." Gebhardt testified that she was previously on the local school board. She described the school district as "[v]ery well off" and that it compared favorably statewide.

¶ 24 Corinne Nye was the executive secretary for the Milledgeville Park District. She testified that, in addition to other duties, she ran an after-school program. Nye testified that she and an assistant picked up the five participating students, including C.H.P., from school and transported them a block or two to the park district in a van. The after-school activities included homework, sports, games, and crafts. According to Nye, C.H.P. was shy at first but then became very happy. Nye testified that the park district was half a block from the bank where Melissa worked. According to Nye, Melissa kept a tidy and clean house and was "very caring," even "overprotective" of C.H.P., although Melissa was gradually giving C.H.P. more independence. Nye testified that Melissa was always timely in picking up C.H.P. from the after-school program.

¶ 25 Mollie Harris testified that she was Melissa's friend and that they saw each other often. Harris described Melissa's relationship with C.H.P. as "solid" and "fun." According to Harris, C.H.P. was a "cool kid," "super intelligent," and "really polite." Harris testified that she sometimes accompanied Melissa and C.H.P. to drop-offs for visitations with Cameron. According to Harris, if C.H.P. showed reluctance to leave Melissa, Melissa encouraged him to be with Cameron. Harris testified that the transitions were usually "pretty smooth," and that C.H.P. was excited to see Cameron. However, Harris testified, sometimes C.H.P. was "cranky" after the long drive to the transition point. Harris testified that Melissa's home was "quite nice" and "neat and organized" with a fenced-in yard. C.H.P.'s bedroom was "[p]retty tidy and neat." Harris testified she took C.H.P. to a function when Melissa was unable to attend because Melissa was caring for

her ill mother. On cross-examination, Harris testified that enrolling C.H.P. in kindergarten in Milledgeville was a "very tough decision" for Melissa to make. Harris testified that Melissa "didn't want to take time away from [Cameron]. But she knew the importance of *** getting [C.H.P.'s] education started." On redirect examination, Harris testified that Melissa "waited as long as she could" to register C.H.P. in kindergarten. According to Harris, C.H.P. was already six years old and was "a little behind getting into kindergarten."

¶ 26    Deborah Judas testified that she had known Melissa's family for 40 years. Judas testified that Melissa's mother had a stroke and that Melissa moved to Milledgeville in 2020 to care for her incapacitated mother. Judas, who was also employed at the bank, testified that Melissa was a "very good worker." Judas thought Melissa liked working at the bank because the hours were flexible. Judas described C.H.P. as a "wonderful little boy." Judas testified that Melissa smoked, but not around C.H.P.

¶ 27    Melissa testified on her own behalf, as follows. She and Cameron were in a relationship for 15 years. They were living in Sweetser, Indiana, when C.H.P. was born. Then they moved to Colorado. Cameron went to Colorado first, and then Melissa and C.H.P. followed. During the four months that Cameron was in Colorado alone, Melissa was C.H.P.'s sole caregiver. In Colorado, Melissa was C.H.P.'s primary caregiver. The parties were living in Colorado when their relationship soured. Even though their relationship had ended, Melissa and Cameron continued to live together. During this time, they shared responsibility for C.H.P. However, after they moved to Dayton, Melissa moved to her own apartment with C.H.P., and the parties split time evenly with C.H.P. The parties' frequent cross-country moves were necessitated by Cameron's employment with the United States Department of Veterans Affairs.

¶ 28        In late July 2019, Melissa's mother, who was in Illinois, suffered a "catastrophic" stroke. Melissa immediately came to Illinois to help care for her mother. Melissa did not intend then to move permanently to Illinois. Cameron was caring for C.H.P. in Ohio. Melissa made frequent trips to Ohio to be with C.H.P. and to resume her work schedule there. In October 2019, Melissa's aunt, who helped care for Melissa's mother, died, leaving Melissa as the only caregiver for her mother. When Melissa decided to move to Illinois permanently, Cameron agreed. After Melissa moved to Illinois, where she has extended family (her mother died in 2020), she communicated with Cameron about C.H.P. via text messages. Melissa facilitated a portal, so Cameron had access to C.H.P.'s medical records.

¶ 29        Melissa's immediate family in the Milledgeville area consisted of a brother and sister-in-law, aunts and uncles, nieces and nephews, and cousins. Cameron's mother, who lived in Freeport, never responded to Melissa's invitations to visit with C.H.P.

¶ 30        Melissa was settling into her new home in Illinois when COVID-19 struck the nation. While she settled in, C.H.P. was with Cameron in Ohio. Melissa felt it would not be safe to transport C.H.P. to Illinois, so C.H.P. remained in Ohio. During that time, Melissa saw C.H.P. once over Mother's Day when she traveled to Ohio. After they felt it was safe, Melissa and Cameron resumed their schedule, rotating visitation with C.H.P. However, Melissa contracted the virus. During her 10-day quarantine, C.H.P. was with Cameron.

¶ 31        When C.H.P. reached school age, Melissa assumed that Cameron would enroll him in school in Indiana because C.H.P. was then in Cameron's care. School started in Indiana on August 11, 2021. However, when Cameron did not place C.H.P. in school but instead returned him to Melissa on August 14, 2021, she enrolled him in school in Milledgeville. The Milledgeville school year started August 20, 2021. Melissa notified Cameron of her action on C.H.P.'s first day

of school. Melissa testified that although Cameron was "pretty set" that the trial court should decide where C.H.P. attended school, she added that Cameron had not indicated where he thought C.H.P. should attend school or filed any petitions with the Ohio court when Melissa enrolled C.H.P. in school in Illinois. (The record reflects that this testimony was mistaken. Cameron filed a petition to modify the shared parenting plan agreement in Ohio on July 9, 2021, and dismissed it in October 2021.) Melissa also denied that any action regarding C.H.P.'s schooling was pending in Illinois when she enrolled C.H.P. in school in Milledgeville. Melissa had consulted a lawyer about placing C.H.P. in school. The lawyer advised Melissa that, at six years of age, C.H.P. was required to be in school or face truancy consequences.

¶ 32      For the first two or three weeks of school, C.H.P. was upset about going to school. After that, he seemed "very happy." C.H.P. participated in school and social activities. When Melissa started working at the bank, she arranged for after-school care with the park district. C.H.P. visited with Cameron via FaceTime for an hour or an hour and a half every other day. Melissa never restricted C.H.P.'s time with Cameron unless it was C.H.P.'s bedtime. Melissa removed Cameron's picture from a frame in C.H.P.'s bedroom because the picture depicted Melissa and Cameron as a couple. Melissa made up for Cameron's lost time with C.H.P. by sending C.H.P. to Cameron every long weekend during the school year. At Thanksgiving, C.H.P. had a whole week off school, but Cameron wanted C.H.P. for only half that time. Due to Melissa pushing Cameron "really hard" and "bull[ying]" him, Cameron took C.H.P. for the entire Thanksgiving holiday.

¶ 33      On cross-examination, Melissa testified as follows. Melissa was seeking majority parenting time because C.H.P. was enrolled in school in Illinois, not because of any parenting faults on Cameron's part. Cameron was a good father. The parties kept to their informal agreement of evenly split parenting time every two weeks until it became impossible due to the COVID-19

pandemic. Then, for C.H.P.'s safety, he remained more than 50 % of the time with Cameron. When Melissa was not able to see C.H.P. during the pandemic, Cameron facilitated communication between Melissa and C.H.P., although Cameron's responses to Melissa's requests were not always prompt. Melissa signed the shared parenting agreement before she moved to Illinois. Then, the shared parenting agreement was ordered by the Ohio court. Melissa considered that agreement still to be in effect.

¶ 34     In April 2021, Melissa and Cameron "agree[d] to disagree" about where C.H.P. would attend school. Melissa did not file any petitions with the court in Ohio. She felt it would not be appropriate, as neither party was living in Ohio. Melissa was "surprised" when Cameron did not enroll C.H.P. in school in Indiana, because he "did need to be in school." That was when Melissa decided to enroll C.H.P. in school in Milledgeville. Cameron knew of her decision a few days before C.H.P. started school because C.H.P. showed Cameron his new backpack. After C.H.P. started school in Milledgeville, it became impossible to follow the split parenting time ordered by the Ohio court. If it had not been for school, Melissa would have continued the split parenting time arrangement.

¶ 35     Melissa had no concerns about C.H.P.'s development. If C.H.P. could not attend the after-school program with the park district, friends or family provided care for C.H.P.

¶ 36                              b. Cameron's Evidence

¶ 37     Cameron testified as follows. Cameron lived in Marion, Indiana. He moved there from Dayton to be closer to Melissa and C.H.P. and because he had friends there.

¶ 38     Before the family moved to Dayton, Cameron was C.H.P.'s primary caregiver due to Cameron's and Melissa's work schedules. After Cameron and Melissa separated, they implemented an informal 50-50 parenting schedule. That schedule was interrupted, however, by a

tornado that affected Melissa's home. So, when Melissa was without power or water for extended periods, Cameron was C.H.P.'s caregiver. Then, beginning in July 2019, when Melissa's mother became ill and Melissa took frequent extended trips to Illinois, Cameron was C.H.P.'s primary caregiver. Cameron enrolled C.H.P. in prekindergarten in Ohio. Melissa's absence did not affect C.H.P. because she and C.H.P. communicated frequently via FaceTime visits and texting. When Melissa became serious about moving to Illinois, Cameron suggested they move as a family to Indiana, which was closer to Illinois than Ohio. Melissa did not agree to that arrangement.

¶ 39        Cameron and Melissa communicated by texting. Cameron considered that an insufficient way to convey information during emergencies. Cameron also considered it reasonable to take his time to respond to Melissa's text messages.

¶ 40        In July 2020, Melissa expressed her desire that C.H.P. attend school in Milledgeville, where Melissa grew up and went to school. Cameron disagreed, because a behaviorist had identified C.H.P. as having a "developmental delay." Cameron wanted to wait a year for C.H.P. to "catch up" with children his age before sending him to school.

¶ 41        When Melissa became serious about moving permanently to Illinois, Cameron feared she would take C.H.P. away from him. Cameron retained an attorney, and the parties eventually signed the shared parenting plan agreement. In 2021, even though Cameron was living in Indiana, his attorney advised him to file for custody in Ohio. So, in July 2021, Cameron filed a motion to modify the shared parenting plan agreement. The Ohio court set a hearing date of August 20, 2021, which never occurred because Melissa's attorney continued the matter. Then, Cameron found out that Melissa enrolled C.H.P. in school in Milledgeville on August 20. Cameron had no FaceTime conversation with C.H.P. before August 20 in which C.H.P. told him about being

- 11 -

enrolled in school. Cameron was "shocked" to learn that C.H.P. was in school because Melissa had agreed to allow the Ohio court to decide where C.H.P. would attend school.

¶ 42 Cameron did not enroll C.H.P. in school in Indiana because he was following the Ohio court's order that the court would decide where C.H.P. attended school. Cameron filed the motion to modify the shared parenting plan agreement in Ohio to comply with the order, although Cameron dismissed his motion in October 2021, when the Illinois court took jurisdiction of the case. Cameron decided to allow the Illinois court to determine the matter.

¶ 43 Cameron wanted C.H.P. to attend Kendall Elementary (Kendall) in Marion, Indiana. Cameron was in a relationship with a woman whose four children attended that school, and Cameron was impressed with how the school treated the children. Cameron also believed that Kendall's programs were tailored to C.H.P.'s interests. However, Cameron stated that Kendall and the Milledgeville school were educationally equal. Cameron described C.H.P. as very intelligent, especially in math. Cameron said C.H.P. was empathetic, and he was without any delay or special needs at this point.

¶ 44 Cameron requested majority parenting time because, among other things, (1) C.H.P. would benefit from having four other children in the household; (2) Cameron was more attentive than Melissa to certain details, such as clipping C.H.P.'s toenails, than was Melissa; (3) C.H.P would be better cared for after school in Indiana; and (4) Cameron and C.H.P. shared a "unique bond." Cameron was concerned with Melissa's ability to facilitate his relationship with C.H.P. because she had removed Cameron's picture from a frame in C.H.P.'s room. Cameron disagreed with Melissa's testimony that it was a picture of them as a couple. Cameron said it was a picture of him with C.H.P. Cameron also disagreed with Melissa's testimony that he did not want

C.H.P. for the entire Thanksgiving holiday. Cameron thought he and Melissa should share that holiday.

¶ 45 On cross-examination, Cameron testified as follows. Cameron did not confer with Melissa before placing C.H.P. in prekindergarten in Ohio. Melissa communicated with Cameron regularly concerning C.H.P.'s medical and school issues. Cameron felt that C.H.P. no longer had developmental issues. Cameron never asked what C.H.P.'s after-school care consisted of, but he had no concerns about the limited number of children in the park district program. Cameron helped C.H.P. with his homework during their FaceTime visits, and C.H.P. was doing well in school. Cameron did not see C.H.P., or ask to see him, during any of the dates Cameron was in Illinois for court appearances. Cameron had dinner with his mother while he was in Illinois, but he did not ask to include C.H.P. On redirect examination, Cameron explained that he always arrived in Illinois and got settled after C.H.P.'s bedtime, so seeing him was not "feasible."

¶ 46 Amanda Lynn Harshman testified that she was in a relationship with Cameron and that she and her four children resided with Cameron. Harshman and Cameron shared household expenses. She testified that the children, including C.H.P., all loved one another and got along well. Harshman testified she was familiar with Kendall, as her children went to school there. Kendall had "wonderful" teachers and activities, including music, science, technology, and engineering. According to Harshman, Kendall's student population was "diverse." Class sizes ranged from 18 to 20 students. Each classroom had a teacher and one or two "interventionists," such as social workers or mental health professionals.

¶ 47 Darla Foulker was C.H.P.'s guardian *ad litem*. She testified as follows. She interviewed the parties, C.H.P., and witnesses. Foulker also reviewed all of the pleadings on file. She did not prepare a report, but instead provided the parties with e-mails. In going through the

statutory factors, Foulker did not find any that favored one parent over the other. Both parents were "wonderful" and did their best for C.H.P. If not for the geographical distance between the parents, Foulker believed they should share parenting responsibilities 50-50. The factor that most favored Cameron was that he had the majority of parenting time while Melissa was in Illinois caring for her mother. The factor most favoring Melissa was that the Milledgeville class size and per capita spending were "more favorable" than Kendall's. However, because neither factor was "huge," it was up to the trial court to weigh all of the factors. Although C.H.P. was already in school in Milledgeville, Foulker did not weigh that in Melissa's favor. According to Foulker, when Melissa enrolled C.H.P. without first telling Cameron, there was not a "clear line of communication," which should have happened. However, Foulker did not "fault" a parent for "getting [a] child in school." On cross-examination, Foulker testified as follows. If Melissa had failed to enroll C.H.P. in school in Milledgeville, C.H.P. would have been truant. Milledgeville had a good curriculum and good testing scores. The "low income" population at Kendall was concerning to Foulker because statistically a low-income population means "there's more crime." However, C.H.P. was "very bright" and would do well "wherever he is." Foulker was "surprised" that Cameron did not see C.H.P. on his visits to Illinois for court dates. C.H.P. was a "joy" to speak with and had "happy" things to say about living with both parents. Foulker expressed that Cameron provided a "wonderful atmosphere" for C.H.P.

¶ 48                    4. *The Court's Ruling and Judgment*

¶ 49        On October 17, 2022, the trial court filed its written memorandum of decision. The court opined the evidence was "very balanced" and that both parents had the ability to provide a safe and nurturing environment for C.H.P. The court noted that if the parents were geographically

close, the court would not disturb the 50-50 parenting arrangement embodied in the Ohio judgment.

¶ 50        The trial court considered the 17 factors set forth in section 602.7(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.7(b) (West 2020)) relating to allocation of parental responsibilities. Specifically, the court found that factors (b)(7), (b)(10), (b)(11), (b)(14), (b)(15), and (b)(16) were not applicable. Respecting factors (b)(4) (any agreement or course of conduct between the parents relating to caretaking functions respecting the child) and (b)(9) (the distance between the parents' residence, the cost and difficulty of transporting the child, each parents' and the child's daily schedules, and the ability of the parents to cooperate), the court found that neither factor weighed in favor of either Melissa or Cameron. The court found that Melissa and Cameron shared responsibilities 50-50 while they were living in Dayton, but that became unworkable after C.H.P. reached school age and the parents were living far from each other. As to the remaining factors, the court found as follows.

¶ 51        a. Factor (b)(1): The Wishes of Each Parent Seeking Parenting Time

¶ 52        The trial court found that both Melissa and Cameron were seeking majority parenting time.

¶ 53             b. Factor (b)(2): The Wishes of the Child

¶ 54        The trial court found that even though C.H.P. was only seven years old and did not testify, he loved both parents and therefore did not have a preference.

¶ 55          c. Factor (b)(3): The Amount of Time Each Parent Spent Performing Caretaking Functions with Respect to the Child in the 24 Months Preceding the Filing of Any Petition for Allocation of Parental Responsibilities

¶ 56    The trial court found that Melissa's and Cameron's cross-petitions were both filed on December 3, 2021, so the 24 months preceding that date would be December 2019. The court found that from December 2019 until June 2020, Cameron was C.H.P.'s primary caregiver. The court noted that during those months, Melissa was caring for her mother, and then the COVID-19 pandemic hit in mid-March 2020. The court found that Melissa and Cameron split parenting time equally from June 2020 to mid-August 2021, when Melissa became C.H.P.'s primary caregiver. The court found that this factor weighed "slightly" in Cameron's favor.

¶ 57    d. Factor (b)(5): The Interaction and Interrelationship of the Child with His or Her Parents and Siblings and With Any Other Person Who May Significantly Affect the Child's

Best Interests

¶ 58    The trial court found that when C.H.P. was with Melissa, he had school friends, enjoyed the Milledgeville Park District's after-school program, and had a close relationship with Harris. When C.H.P. was with Cameron, he had a close relationship with Harshman and a sibling-like relationship with her children.

¶ 59    e. Factor (b)(6): The Child's Adjustment to His or Her Home, School, and

Community

¶ 60    The trial court found that C.H.P. "flourished" in school in Milledgeville. The court noted, though, there was no evidence to suggest that C.H.P. might not also have flourished in Indiana. The court found that C.H.P. was a "bright and inquisitive" little boy with parents who were dedicated to his development. The court found that both schools had "positives." Milledgeville's school spent more on its students and had higher test scores and smaller class sizes. Kendall had more activities and a diverse student population. The court found that this factor weighed "slightly" in Melissa's favor.

¶ 61                                    f. Factor (b)(8): The Child's Needs

¶ 62          The trial court found that both parents provided for C.H.P.'s needs.

¶ 63          g. Factor (b)(12): The Willingness and Ability of Each Parent to Place the Needs

of the Child Ahead of His or Her Own Needs

¶ 64          The trial court found that both Melissa and Cameron tried to maximize the time that

C.H.P. spent with the other parent. Melissa made C.H.P. available to Cameron via FaceTime on

weeknights and weekends, and she used her vacation time to drive a great distance for the in-

person exchanges. Cameron put other matters aside to spend time on FaceTime with C.H.P.

¶ 65    h. Factor (b)(13): The Willingness and Ability of Each Parent to Facilitate and

Encourage a Close and Continuing Relationship Between the Other Parent and the Child

¶ 66          The trial court found that both parents demonstrated a willingness and ability to

facilitate and encourage a close relationship with C.H.P. "under the current circumstances." The

court noted that both parents facilitated FaceTime encounters with C.H.P. and shared information

when C.H.P. was in their respective care.

¶ 67          i. Factor (b)(17): Any Other Factor the Court Expressly Finds Relevant

¶ 68          The trial court found it significant that Melissa had extended family in the

Milledgeville area while Cameron had none in Marion, Indiana.

¶ 69          The trial court found, after having considered the relevant factors, that C.H.P.'s best

interests required a ruling in favor of Melissa's petition. Accordingly, the court granted Melissa's

petition and denied Cameron's petition. The court also entered a "Final Parental Allocation

Judgment."

¶ 70          5. *The Court's Ruling on Cameron's Contempt Petition*

¶ 71 On November 1, 2022, the trial court entered a written order denying Cameron's contempt petition, finding that Cameron failed to prove that Melissa's act of enrolling C.H.P. in school was contemptuous. The court took judicial notice of the evidence adduced at the hearing on the cross-petitions for modifying parental responsibilities. The court found that when Cameron delivered C.H.P. to Melissa on August 14, 2021, C.H.P. was six years old and subject to compulsory school attendance in Illinois. The court cited section 26-1 of the School Code (105 ILCS 5/26-1 (West 2020)), requiring anyone having custody of a child of the age of six years to cause that child to attend some public school in the district in which the child resides. The court found that because Cameron had not enrolled C.H.P. in school in Indiana, Melissa placed him in school in Milledgeville, where he started classes on August 20, 2021. The court further found that after C.H.P. started school, the split parenting time ordered by the Ohio court was not an option, "given the minor's age."

¶ 72 This timely appealed followed.

¶ 73                                    II. ANALYSIS

¶ 74 Cameron raises the following issues: (1) in considering factor (b)(3) of section 602.7 of the Act (the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities), the trial court erred in using December 3, 2021, as the beginning of the 24-month period; (2) the court erred in denying the contempt petition; and (3) the court's grant of Melissa's petition to modify the shared parenting plan agreement and the denial of Cameron's similar petition were against the manifest weight of the evidence.

¶ 75 Both parties filed petitions on December 3, 2021, asking for majority parenting time. When these cross-petitions were filed, Melissa was the primary parent because C.H.P. was

attending kindergarten in Milledgeville. Determining custody (*i.e.*, allocation of parental responsibilities, meaning decision making and parenting time) is within the trial court's sound discretion. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. Because the trial court is in the best position to judge the credibility of the witnesses and determine the child's best interests, we apply a deferential standard of review. *G.L.*, 2017 IL App (1st) 163171, ¶ 24. Accordingly, the following principles apply: (1) where the evidence permits more than one inference, we accept those inferences supporting the trial court's order and (2) we will not reverse the trial court's custody determination unless it is against the manifest weight of the evidence, is manifestly unjust, or results from a clear abuse of discretion. *G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 76    Cameron and Melissa were never married. However, section 808 of the Illinois Parentage Act of 2015 provides that any allocation of parental responsibilities or parenting time shall be made in accordance with the relevant factors specified in the Act. 750 ILCS 46/808 (West 2020). Pursuant to section 602.7(a) of the Act (750 ILCS 5/602.7(a) (West 2020)), the trial court shall allocate parenting time according to the child's best interests. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 14. In allocating parenting time, the trial court shall consider all relevant factors, including: (1) the wishes of each parent; (2) the child's wishes; (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities; (4) any prior agreement or course of conduct between the parents relating to caretaking functions of the child; (5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests; (6) the child's adjustment to his or her home, school, and community; (7) the mental and physical health of everyone involved; (8) the child's needs; (9) the distance between the parents' residences, the cost and

difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) the physical violence or threat of physical violence by the parent directed against the child or other member of the child's household; (12) the willingness and ability of each parent to place the child's needs ahead of his or her own needs; (13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the child and the other parent; (14) the occurrence of abuse against the child or other member of the child's household; (15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the nature of the offense and any treatment the offender has successfully engaged in; (16) the terms of a parent's military family-care plan prior to deployment; and (17) any other factor the trial court deems relevant. 750 ILCS 5/602.7(b)(1-17) (West 2020); *Whitehead*, 2018 IL App (5th) 170380, ¶ 14. Parenting time can be modified upon demonstrating that a substantial change has occurred either in the child's circumstances or that of either parent and modification is necessary for the child's best interests. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 43.

¶ 77        With the above principles in mind, we turn to Cameron's contentions.

¶ 78            A. The 24-Month Period for Looking at the Amount of Each Parent's Caretaking

Time

¶ 79        The trial court found that factor (b)(3), the amount of each parent's caretaking time, "slightly" favored Cameron. The court used December 3, 2021, as the start of the 24-month period to determine that Cameron was C.H.P.'s primary caregiver from December 2019 until June 2020. The court looked back 24 months from December 3, 2021, because that was when Cameron filed his petition to modify the shared parenting plan agreement in Carroll County. Cameron argues,

without citing any authority, that because factor (b)(3) provides that the court looks at the 24-month period preceding the filing of *any* petition, the trial court should have looked back 24 months from July 9, 2021, when Cameron filed his petition to change custody in Ohio. Cameron asserts that had the court done so, it would have found that he was C.H.P.'s primary caregiver for 12 months instead of only 6 months. Cameron argues that Melissa began spending time away from C.H.P. in July 2019. Cameron contends that the additional months would have "completely changed" the trial court's opinion that factor (b)(3) only "slightly" favored him. Cameron posits that, had the court not committed error in looking back from December 3, 2021, factor (b)(3) would have weighed "heavily" (emphasis omitted) in his favor.

¶ 80        Cameron relies on *Both v. Nelson*, 31 Ill. 2d 511, 514 (1964), for the proposition that errors affecting the outcome in a close case require reversal. Here, we agree the case was close. The trial court found that it would not disturb the 50-50 parenting arrangement if not for the parties' geographical distance.

¶ 81        Melissa argues that December 3, 2021, was the proper "look-back" date because (1) the Ohio judgment was not enrolled in Illinois until October 2021; (2) Cameron's July 9, 2021, petition filed in Ohio was never acted upon by the Ohio court and was not filed in the Illinois proceeding; and (3) Melissa was C.H.P.'s primary caregiver starting in August 2021, when C.H.P. began school in Milledgeville. Cameron notes that the July 9 petition was admitted as an exhibit in the current proceedings and was therefore before the Illinois court. Further, Cameron argues that his dismissal of the July 9 petition was immaterial, as the trial court was obligated to protect C.H.P.'s best interests regardless of whether " 'procedural technicalities have been observed.' "

¶ 82        A reviewing court will not find an error to be reversible unless the party claiming error demonstrates that the error was "substantially prejudicial" and "affected the outcome of the

trial." *Ford v. City of Chicago*, 132 Ill. App. 3d 408, 416 (1985). Even assuming, without deciding, that July 9, 2021, was the proper "look-back" date, we conclude that Cameron has not demonstrated that the trial court's custody determination was against the manifest weight of the evidence.

¶ 83        Specifically, Cameron does not demonstrate how looking back from July 9, 2021, alters the trial court's findings that both parents enjoyed a close relationship with C.H.P. and both met his needs. Cameron has not demonstrated how crediting him with 12 months as primary caregiver, as opposed to 6 months, would alter the outcome. Melissa correctly notes that she became C.H.P.'s primary caregiver from August 2021 onward. We note that the court placed weight on the additional factor that Melissa had extended family in the Milledgeville area, whereas Cameron had none in Indiana. Maintaining close ties with extended family is an important consideration in making a custody determination. *In re Marriage of Stopher*, 328 Ill. App. 3d 1037, 1046 (2002). Consequently, we hold that even if the court erred in using the December 3, 2021, date, the error did not affect the outcome. Where we can see from looking at the entire record that any error did not affect the outcome below, we will not disturb the court's judgment. *Simmons v. Garces*, 198 Ill. 2d 541, 566-67 (2002).

¶ 84                B. The Trial Court's Ruling on the Contempt Petition

¶ 85        The shared parenting plan agreement, which was adopted by the Ohio court as its final order, required the parties either to agree on a school district when C.H.P. reached school age or submit the issue to the court for resolution. Cameron did not agree to send C.H.P. to school in Milledgeville. Melissa enrolled C.H.P. in kindergarten without first obtaining a court order. The trial court declined to find Melissa in contempt.

¶ 86 Cameron argues that the trial court's ruling was against the manifest weight of the evidence where (1) C.H.P. was not a resident of Illinois and was not subject to compulsory school attendance in Illinois and (2) Melissa enrolled C.H.P. in school without attempting to comply with the court order and without waiting for the Ohio court to rule on Cameron's petition to place C.H.P. in school in Indiana.

¶ 87 Generally, "civil contempt" occurs when a party does not do something required by a court order. (Internal quotations marks omitted.) *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 50. Proof of willful disobedience of a court order is necessary to a finding of indirect civil contempt. *Knoll*, 2016 IL App (1st) 152494, ¶ 50. Initially, the petitioner must establish that the alleged contemnor violated a court order. *Knoll*, 2016 IL App (1st) 152494, ¶ 50. If the petitioner establishes such a violation, the burden shifts to the alleged contemnor to show that the violation was not "willful and contumacious" and that he or she had a valid excuse for not following the order. *Knoll*, 2016 IL App (1st) 152494, ¶ 50. Whether a party is guilty of contempt is a question of fact, and we will not disturb a trial court's finding unless it is against the manifest weight of the evidence or the record demonstrates an abuse of discretion. *Knoll*, 2016 IL App (1st) 152494, ¶ 50.

¶ 88 Section 26-1 of the School Code requires anyone having custody of a child of the age of six years to cause that child to attend some public school in the district in which the child resides. 105 ILCS 5/26-1 (West 2020). Cameron contends that C.H.P. did not reside in the Milledgeville school district. Without citing authority, Cameron argues that the term "reside" does not apply to a 50-50 custody arrangement such as he and Melissa shared. Under Cameron's theory, C.H.P. would not have resided in Indiana, either. Because under Cameron's theory C.H.P. resided nowhere, it follows that C.H.P. would never need to be enrolled in any school. Cameron concedes,

however, that for purposes of the School Code, the general rule is that a child "resides" in the school district where the parents reside. *School District No. 153, Cook County v. School District No. 154 1/2, Cook County*, 54 Ill. App. 3d 587, 591 (1977). There is no question that Melissa resided in the Milledgeville school district. Consequently, when C.H.P. was in Melissa's custody, he resided in the Milledgeville school district. (Melissa testified that a lawyer advised her that C.H.P. was subject to the requirements of the School Code.)

¶ 89        Melissa contends that she did not violate the Ohio order, as it did not prohibit either party from enrolling C.H.P. in school. The order provided as follows:

> "The parties agree that once the child reaches school age, that [*sic*] they will make a mutual agreement concerning which school district the minor child will attend. *If an agreement is unable to be reached, the parties shall allow the Court to decide which school district is in the best interest of the minor child.*" (Emphasis added.)

We disagree with Melissa's interpretation of the order. Although the order did not expressly prohibit either party from enrolling C.H.P. in school, the intent clearly was for the parties to seek a court order if they did not agree on a school district. Obviously, enrolling the child in school was conditioned upon obtaining a court order.

¶ 90        The trial court ruled that Melissa did not willfully and contumaciously violate the Ohio order because she acted in compliance with the School Code. Melissa testified that she expected Cameron to place C.H.P. in school in Indiana on August 11, 2021, and she was "shocked" when Cameron returned C.H.P. to Illinois on August 14. Melissa testified it was then she decided to place C.H.P. in school in Milledgeville because classes started on August 20. Melissa testified she acted upon the advice of counsel that C.H.P. would be truant if he were not in school.

¶ 91 We disagree with Cameron that the excuse of complying with the School Code is unavailable to Melissa. Cameron relies on *County of Cook v. Lloyd A. Fry Roofing Co.*, 59 Ill. 2d 131, 137 (1974), where the supreme court held that an inability to comply with a court order is no excuse if the alleged contemnor voluntarily creates the incapacity. *Fry Roofing Co.* is inapposite. In that case, our supreme court noted that the claimed "inability" was created by the alleged contemnor's own lack of diligence and even intentional disregard of a court order. *Fry Roofing Co.*, 59 Ill. 2d at 137-38. In *Fry Roofing Co.*, the defendant entered into an agreed order for installing pollution control equipment by a certain date. *Fry Roofing Co.*, 59 Ill. 2d at 133. However, the defendant accepted a construction bid with "full knowledge" that the contractor would not even begin work before the date specified in the agreed order, and a purchase order for a cement foundation was not made until after a "substantial portion" of the compliance period had elapsed. *Fry Roofing Co.*, 59 Ill. 2d at 138. Here, Melissa testified that she formed the intent to enroll C.H.P. in school in Milledgeville only when Cameron returned C.H.P. to her on August 14, and C.H.P. was required by law to be in school on August 20. A party is not guilty of contempt for his or her inability to obey a court order. *People ex rel. Melendez v. Melendez*, 47 Ill. 2d 383, 387 (1971).

¶ 92 Cameron argues that Melissa should have obtained a ruling on his July 9 petition pending in Ohio before she placed C.H.P. in school in Illinois. Melissa testified that she did not consider Ohio an appropriate forum because neither she nor Cameron lived there. Indeed, the Ohio court's exclusive, continuing jurisdiction had ended before Cameron filed the petition there because neither party then lived in Ohio. See *Gorup v. Brady*, 2015 IL App (5th) 150078, ¶ 27 (Under the Uniform Child-Custody Jurisdiction and Enforcement Act (750 ILCS 36/101 *et seq.* (West 2020)), a state's exclusive, continuing jurisdiction ends when neither party lives in the

state.). Melissa acted in June 2021 to enroll the judgment in Illinois, and the Illinois court enrolled the judgment on August 3, 2021. However, because Cameron opposed enrolling the judgment in Illinois, the trial court vacated its August 3 order. Then, on September 3, 2021, Melissa offered to transfer the July 9 Ohio petition to Illinois for resolution, but, Cameron testified, he dismissed that petition in October 2021. By October 14, C.H.P. was in school pursuant to Melissa's obligation under the School Code. Under these facts, we cannot say that the court's finding of no contempt was against the manifest weight of the evidence.

¶ 93        C. Whether the Trial Court's Grant of Melissa's Petition to Modify the Ohio Order Was Against the Manifest Weight of the Evidence

¶ 94        Cameron argues that the trial court improperly analyzed factors (b)(3), (b)(4), and (b)(13) of section 602.7 of the Act in granting Melissa's petition to modify the shared parenting plan agreement. Courts may consider any relevant factors when determining the child's best interests. *G.L.*, 2017 IL App (1st) 163171, ¶ 38. This court will not reverse a trial court's custody decision unless it is against the manifest weight of the evidence, is manifestly unjust, or results from an abuse of discretion. *In re Marriage of Marsh*, 343 Ill. App. 3d 1235, 1240 (2003). We will not substitute our discretion for that of the trial court. *Marsh*, 343 Ill. App. 3d at 1240. Nor will we find an abuse of discretion unless the trial court acted arbitrarily without conscientious judgment or exceeded the bounds of reason and ignored recognized principles of law so that substantial injustice resulted. *Marsh*, 343 Ill. App. 3d at 1240.

¶ 95        Respecting factor (b)(3), the amount of each parent's caretaking time, we have already determined that the trial court did not commit reversible error in using December 3, 2021, as the "look-back" date.

¶ 96         Factor (b)(4) is the parties' prior agreements and conduct. The trial court found that this factor favored neither party, as the shared parenting plan agreement stipulated the parties shared custody 50-50. Cameron argues that the court should have considered that from July 2019 until June 2020, he was C.H.P.'s primary caregiver. Cameron asserts that because of Melissa's absence from Ohio during that period, C.H.P. was "entirely" (emphasis omitted) in his care. Cameron argues that had the court considered the parties' informal arrangement while Melissa was in Illinois, it would have found that this factor favored Cameron. Even if Cameron is correct, he does not demonstrate how this factor would have changed the outcome. From August 14, 2021, onward, C.H.P. was in Melissa's primary care. Furthermore, in discussing factor (b)(3), the court considered the period that Cameron cared for C.H.P. from July 2019 to June 2020. Thus, the court did not ignore the importance of that period in making its ultimate determination.

¶ 97         As to factor (b)(13), the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, the trial court found that this factor was "equally applicable to both parents." The court noted that they both coordinated and scheduled FaceTime encounters with the other parent and shared information about C.H.P. Cameron argues that the court failed to "adequately" consider that Melissa unilaterally enrolled C.H.P. in school in Milledgeville without prior notice to Cameron. Cameron asserts that this was especially significant given the parties' geographical distance and that Melissa hoped to gain a strategic litigation advantage. Melissa testified that C.H.P. told Cameron several days before he started school that he would be attending kindergarten in Milledgeville. Cameron denied that this conversation happened. The record shows that Melissa did not gain a strategic advantage by enrolling C.H.P. in school, because Foulker testified that she purposefully did not consider the fact that C.H.P. was in school in making her recommendations. Harris testified that

enrolling C.H.P. in school in Milledgeville was a difficult decision for Melissa, as Melissa did not want to deprive Cameron of time with C.H.P. We also note that Melissa was willing to make C.H.P. available to Cameron when Cameron came to Carroll County for court dates, but Cameron declined to see his son on those occasions. In sum, Cameron simply asks us to reweigh the section 602.7(b) factors, which we cannot do. As we noted in *In re Marriage of Apperson*, 215 Ill. App. 3d 378, 383 (1991), "[i]n custody cases, seldom is either parent shown to be perfect." We afford the trial court's determination great deference, as the court is in a superior position to judge the credibility of the witnesses and determine the child's needs. *Apperson*, 215 Ill. App. 3d at 383. Accordingly, we affirm the court's decision to grant Melissa's petition to modify the shared parenting plan agreement and deny that of Cameron.

¶ 98                                  III. CONCLUSION

¶ 99            For the reasons stated, we affirm the trial court's judgment.

¶ 100           Affirmed.